Ricky WYATT, By and Through his aunt and legal guardian Mrs. W.C. RAWLINS, Jr., et al., Plaintiffs,

v.

Kathy E. SAWYER, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health, Officer, et al., Defendants,

United States of America,
Amicus Curiae.

No. CIV.A. 70–T–3195–N.

United States District Court,
M.D. Alabama,
Northern Division.

July 13, 2000.

Ira A. Burnim, Leonard S. Rubenstein, Linda V. Priebe, Washington, DC, James M. Lichtman, Ropes & Gray, Washington, DC, Fem Singer, Sirote & Permutt, Birmingham, AL, James A. Tucker, Alabama Disabilities Advocacy Program, Tuscaloosa, AL, Kathryn H. Sumrall, Jackson, Garrison & Sumrall, Birmingham, AL, Allen Smith, Jr., Warm Springs, MT, Iris Eytan, San Francisco, CA, for plaintiffs.

Algert S. Agricola, Jr., Wallace, Jordan, Ratliff & Brandt, L.L.C., Montgomery, AL, Ricky J. McKinney, Burr & Forman, Birmingham, AL, Mary Elizabeth Culberson, Courtney Wayne Tarver, Office of the Attorney General, Montgomery, AL, Edward A. Hosp, Governor's Office Montgomery, AL Charles B. Campbell, Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, AL, James Darrington Hamlett, Devereanx & Associates, Montgomery, AL, June E. Lynn, G.R. (Rick) Trawick, Department of Mental Health & Mental Retardation, Bureau of Legal Services, Montgomery, AL, Gregory D. Crosslin, Clifton E. Slaten, Mindi C. Robinson, Crosslin, Slaten & O'Connor, P.C., Montgomery, AL, for Defendants.

Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, Bill Lann Lee, Robinsue Frohboese, Judith C. Preston, Tawana E. Davis, Robert C. Bowman, United States Department of Justice, Civil Rights Division, Special Litigation Section, Washington, DC, for United States of America, amicus.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

In October 1999, as this case challenging conditions in the Alabama Mental Health and Mental Retardation System approached its 30th birthday, this court wrote with some optimism:

> "[I]t is apparent that this litigation is steadily progressing toward its final resolution. Contributing to these efforts, newly appointed Commissioner of Men-

tal Health and Mental Retardation Kathy E. Sawyer has, as this court recently observed, directly addressed one of the primary concerns of the court: the past unwillingness of the Mental Health and Mental Retardation Department to address rather than hide serious problems. As this court stated in its order of October 7, 1999: 'Commissioner Sawyer has made clear that all problems will be "aired" and that all will be directly and forcefully addressed. Therefore, it appears now within sight that, under the leadership of Commissioner Sawyer, this litigation will come to an end in the near future, and certainly within her stint as Commissioner.' "

*Wyatt v. Sawyer,* 190 F.R.D. 685, 689 (M.D.Ala.1999) (Thompson, J.) (quoting *Wyatt v. Sawyer,* 67 F.Supp.2d 1331, 1358 (M.D.Ala.1999) (Thompson, J.)). Just a few months later, on January 20, 2000, the parties reached a settlement agreement, and, on January 27, filed a joint motion for judicial approval of the agreement.[1] On May 4, 2000, the court conducted a fairness hearing, and, based on a close examination of the agreement, the objections and other responses filed by plaintiff-class members and other interested persons, and the testimony offered at the fairness hearing, the court entered an order the next day approving the agreement, and promised that a memorandum opinion would follow later.[2] This is the promised opinion.

## I. BACKGROUND

This litigation has traveled a long, winding, and often quite bumpy course, which the court has described at length in prior opinions and need not recount here. *See, e.g., Wyatt v. Rogers,* 985 F.Supp. 1356 (M.D.Ala.1997) (Thompson, J.). However, a brief overview of the case's general trajectory and major turning points will serve as a useful foundation for consideration of the matter currently before the court.

*1970–1974:* The first phase of this litigation featured "expansive and landmark opinions," *Wyatt,* 985 F.Supp. at 1361, of Judge Frank M. Johnson, Jr., finding "that conditions in the facilities operated by the Alabama Department of Mental Health and Mental Retardation violated patients' constitutional rights," *id.,* and enjoining the defendants "to bring the facilities into compliance with certain minimum constitutional standards." *Id.* More specifically, in 1972, the court entered injunctions requiring the defendants to bring state facilities into compliance with certain minimum constitutional standards, now commonly referred to as the 'Wyatt standards,' *see Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972) (standards for mentally ill) (Johnson, J.), *aff'd in relevant part,* 503 F.2d 1305 (5th Cir.1974); *Wyatt v. Stickney,* 344 F.Supp. 387 (M.D.Ala.1972) (standards for mentally retarded) (Johnson, J.), *aff'd in relevant part,* 503 F.2d 1305 (5th Cir.1974).

*1975–1980:* In the second phase, the parties focused on the defendants' noncompliance with these minimum constitutional standards. The plaintiffs and amicus curiae United States of America petitioned the court to appoint a special master or receiver to assure compliance, and both opposed a petition by the Governor of Alabama to be appointed as receiver of the State Mental Health and Mental Retardation System. Ultimately, following extensive hearings and appeals on the issue, the court appointed the Governor as receiver.

*1981–1990:* The plaintiffs triggered the third phase with their motion for sufficient state funding to ensure implementation of the Governor's plan of compliance with the *Wyatt* standards; in response, the Governor moved for termination of the receivership while the defendants moved to eliminate all of the *Wyatt* standards and to

---

1. *See* Doc. no.2052.

2. *See* order of May 5, 2000 (Doc. no. 2142, attached here as appendix A), and agreement

filed on May 5, 2000 (Doc. no. 2141, attached here as appendix B).

substitute in their place a requirement that the defendants achieve accreditation of the State's mental-illness facilities by the Joint Commission on the Accreditation of Healthcare Organizations (JCAHO) and certification of the mental-retardation facilities through Title XIX of the Social Security Act, 42 U.S.C.A. § 1396, *et seq.* The parties settled these conflicts, and, on September 22, 1986, this court approved a five-page consent decree which reflected a resolution of three issues, among others: (1) the defendants' desire to terminate court supervision of the state system; (2) the plaintiffs' concern about the continued viability of the *Wyatt* standards; and (3) the plaintiffs' efforts to focus the litigation on the provision of community facilities and programs and the placement of qualified patients in those facilities and programs. *See Wyatt v. Wallis,* 1986 WL 69194 (M.D.Ala. Sept.22, 1986) (Thompson, J.).

*1991–1997:* The next round of litigation focused on the defendants' attempts to terminate this lawsuit upon a judicial finding that they had met their obligations under the 1986 consent decree. At the conclusion of a 35–day trial spanning several months in 1995, the court found that the defendants had acted in good faith with regard to some but not the whole 1986 consent decree, and it concluded that they should be released from the decree to the extent of their compliance with 17 of the mental-illness standards and 35 of the mental-retardation standards, as well as the requirement of JCAHO accreditation at all mental-illness facilities and Title XIX certification at all mental-retardation facilities. At this time the court also directed the parties to shift their focus to a standard-by-standard approach. *See Wyatt v. Rogers,* 985 F.Supp. 1356 (M.D.Ala.1997) (Thompson, J.).

*1998–present:* The parties devoted much of 1998 and 1999 to discovery, including facility inspections by the plaintiffs' experts, on disputed compliance issues, several of which were either resolved or narrowed for the trial that had been scheduled for May and June 2000. *See,* *e.g., Wyatt v. Rogers,* 1998 WL 213779 (M.D.Ala. Apr. 21, 1998); *Wyatt v. Rogers,* 1998 WL 264783 (M.D.Ala. May 14, 1998); *Wyatt v. Rogers,* 1998 WL 862920 (M.D.Ala. Dec.9, 1998); *Wyatt v. Sawyer,* 1999 WL 805285 (M.D.Ala. Oct.4, 1999). Regularly scheduled status conferences with the court kept the parties focused. Negotiations intensified in 1999 when both parties retained settlement counsel independent of litigation counsel, which culminated in the settlement agreement now submitted for judicial approval.

## II. SUMMARY OF THE SETTLEMENT AGREEMENT

The settlement agreement executed on January 20, 2000, proposes to dissolve the 1986 consent decree, settle the compliance disputes which have persisted since 1986, and finally bring to an end the federal court's long-term monitoring and control of the Alabama Department of Mental Health and Mental Retardation. Included in the settlement agreement are important provisions which guarantee that the State of Alabama will maintain its commitment to minimum constitutional standards for treatment and habilitation and significantly enhance and expand its services to the mentally ill and mentally retarded. Following is a summary of the settlement agreement's most significant provisions.

*Accreditation:* All of the State's mental-illness facilities are accredited by the JCAHO and all of the developmental centers are certified by the Health Care Financing Administration. These accreditations and certifications will be maintained.

*Advocacy Program:* The State Mental Health and Mental Retardation Department will maintain a trained staff of at least 26 full-time equivalent advocates for the effective operation of its internal advocacy program, which is designed to educate persons about client rights, to review or investigate complaints of rights violations, and to monitor conditions in mental-

illness and mental-retardation facilities and in certified community programs.

*Census Reduction:* During the three-year period between October 1, 2000, and September 30, 2003, the department shall reduce by a total of 300 the number of extended-care mental-illness beds at Bryce Hospital, Searcy Hospital, and Thomasville Mental Health Rehabilitation Center and by a total of 300 the number of extended-care mental-retardation beds at Partlow Developmental Center, Albert P. Brewer Developmental Center, J.S. Tarwater Developmental Center, and Lurleen B. Wallace Developmental Center. The settlement agreement does not require closure of any state facilities.

*Community Placement:* By September 1, 2000, the department shall develop a plan, to be implemented between October 1, 2000, and September 30, 2003, to identify consumers to be out-placed from mental-illness facilities and to increase community-based placements and community-based services for them. By the same deadlines, the department shall also develop and implement a plan to identify consumers to be out-placed from mental-retardation facilities and to increase community-based placements and community-based services for them.

*Public Education:* The Department of Mental Health and Mental Retardation and the Alabama Disabilities Advocacy Program ("ADAP") have agreed to develop and implement a comprehensive, statewide plan to enhance the public's appreciation for the abilities, rights, and needs of the persons with mental illness and the persons with mental retardation who are served by the department.

*Quality Improvement:* The department has incorporated into its Policy and Procedures Manual compliance mechanisms and structures related to client treatment, care, rights, and services required by the 1986 consent decree and the *Wyatt* standards for adequate treatment of persons with mental illness and for adequate habilitation of persons with mental retardation. The settlement agreement requires the department to maintain its system-wide policy commitment to these minimum constitutional standards, to require that all facilities utilize the Policy Manual and expressly adhere to and implement all of these policies. Additionally, the settlement agreement requires that the department continue operating its Continuous Quality Improvement ("CQI") systems in order to monitor the quality of mental-health and mental-retardation services provided to persons served in state-operated psychiatric facilities and developmental centers. The department must maintain at least one full-time, trained CQI employee in the mental-illness divisional office, in the mental-retardation divisional office, and at each facility.

*Safety and Protection:* When there are allegations of abuse and neglect in mental-health and mental-retardation facilities, the department must conduct timely investigations, using standard operating procedures and trained employees. ADAP shall have a representative on each facility's investigation committee, and the department must provide specified notice and reports to ADAP concerning deaths, major personal injuries, suspected neglect, mistreatment, sexual assault, exploitation or abuse involving a departmental consumer.

*Treatment and Habilitation:* The department must develop, review, and permit ADAP to have input concerning individualized treatment plans for each resident at Bryce, Searcy, and Thomasville facilities. The department agrees to hire qualified professional consultants to study, and to recommend policies and procedures regarding treatment and discharge plans for all juveniles and for adults who have special needs relating to these diagnoses: a dual diagnosis of mental illness and mental retardation; traumatic or organic brain injury; self-injurious behavior; HIV/AIDS/ARC; deafness, blindness, or serious physical impairments. The department also agrees to hire qualified professional consultants to study and to make recommendations concerning the use of seclusion and

restraint for consumers with self-injurious behavior at Bryce and Searcy Hospitals and the use and administration of psychiatric medications.

For residents at Wallace, Partlow, Brewer, and Tarwater facilities, the department must develop, implement, and permit ADAP to have input concerning individualized habilitation plans. The department also agrees to secure professional assessments and recommendations regarding both systemic and clinical matters relevant to the habilitation of persons with mental retardation.

*Term of the Settlement Agreement:* The settlement agreement became effective immediately upon entry of the court's May 5, 2000, order. The projected ending date for the agreement is not later than September 30, 2003, which is the final deadline for the State to complete certain obligations undertaken in the agreement. The court retains jurisdiction over this case for the limited purpose of enforcing the settlement agreement, and the agreement outlines procedures to resolve any compliance dispute.

## III. DISCUSSION

■ Judicial policy favors voluntary settlement as the means of resolving class-action cases. *See Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977).[3] However, "the settlement process is more susceptible than the adversarial process to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is 'fair, adequate, and reasonable.'" *Paradise v. Wells,* 686 F.Supp. 1442, 1444 (M.D.Ala.1988) (Thompson, J.) (quoting *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir. 1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979)). This abuse can occur when, for example, "the interests of the class lawyer and the class may diverge, or a majority of the class may wrongfully compromise, betray or 'sell-out'

the interests of the minority." *Id.* Besides evaluating the fairness of the settlement agreement, the court has the duty to make sure that the settlement is not illegal or against public policy. *See Piambino v. Bailey,* 757 F.2d 1112, 1119 (11th Cir. 1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986).

### A. *Class Notice*

■ As a preliminary matter, Rule 23(e) of the Federal Rules of Civil Procedure requires that the court ensure that all interested parties were informed of the settlement and had the opportunity to voice their objections. This issue is particularly salient in the instant litigation because so many members of the plaintiff class lack the capacity to advocate effectively on their own behalf. The court must therefore take special care to ensure not only that the class members themselves, but also their guardians, advocates, and other interested persons were notified of the proposed settlement agreement and given adequate opportunities to voice their opinions on the class members' behalf.

The court-approved notice was directed to "patients, residents, clients, and consumers served by the Alabama Department of Mental Health and Mental Retardation, their families, and legal guardians; individuals, groups, and organizations involved in advocacy or support for the rights of Alabama's citizens with mental illness and mental retardation; and interested members of the general public." The notice advised that the settlement agreement proposed "to dissolve the 1986 consent decree, settle the compliance disputes which have persisted since 1986, and finally bring to an end the federal court's long-term monitoring and control of the Alabama Department of Mental Health and Mental Retardation." In plain and simple language, the notice highlighted substantive terms and requirements, stat-

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

ed the projected effective date and ending date for the settlement agreement, and outlined the federal court's role. Most importantly, the notice detailed alternative means for reviewing and securing copies of the complete agreement, identified official representatives for questions, specified the process for making objections, stated the date, time, and place for the fairness hearing, and authorized discretionary attendance or participation in the fairness hearing.

As shown by the joint evidentiary submission regarding notice of settlement agreement and timely filed responses, the parties disseminated the notices as stipulated in the court-approved plan. Notices were posted prominently in the living areas of all facilities covered by this agreement, and notices were hand-delivered to approximately 1,083 patients and residents while departmental advocates consulted with another 450 for whom hand-delivery was deemed clinically inappropriate. Mail-delivery notice was given to 695 persons identified as legal guardians or responsible parties for patients and residents while 17 notices were mailed to consumer and advocacy organizations with statewide constituencies.

The evidence also reflects newspaper publication of the notice in each of the cities housing a mental-health facility. Additionally, Commissioner Sawyer and counsel for the plaintiff class maximized the interested public's understanding of the settlement agreement with their joint presentations to advocacy groups in these same cities along with several individual presentations across the State as well as news releases and written communications.

The adequacy of the notice is reflected, in part, by the substantial number of written responses timely filed before the fairness hearing and by the attendance and participation at the fairness hearing. Forty-five comments were timely received, nine of which are in the nature of objections. The court also conducted a fairness hearing on May 4, 2000, which many class members and their advocates attended, and at which many took the opportunity to voice objections to the proposed settlement. The court concludes that these measures, taken together, were sufficient to satisfy the notice requirements of Rule 23(e).

**B. *Plaintiffs' Objections and Comments***

■ "In determining whether a settlement is fair, adequate, and reasonable, the obvious first place a court should look is to the views of the class itself." *Paradise,* 686 F.Supp. at 1444. Determining those views and quantifying them in a manner that enables the court to determine whether the settlement is fair is, however, not always easy. The court should be careful "not [to] allow a majority, no matter how large, to impose its decision on the minority," *Pettway,* 576 F.2d at 1217; the court should be certain "that the burden of the settlement is not shifted arbitrarily to a small group of class members." *Id.* However, where the settlement provides for structural changes, with each class member having a virtually equivalent stake in the changes, and where there are no conflicts of interest among class members or among definable groups within the class, then the decision to approve the settlement "may appropriately be described as an intrinsically 'class' decision in which majority sentiments should be given great weight." *Id.*

As noted above with respect to the notice issue, the court must take special care in this case to consider carefully the opinions of those who filed objections or otherwise responded to the notice of settlement agreement. This is because many of the class members, as consumers of mental-health services, are not well-equipped to advocate on their own behalf in this litigation. The court must therefore rely on family, friends, other advocates, and those class members who are capable of voicing their opinions to communicate the interests of those who cannot. For this reason, the court takes the opinions of these advocates very seriously.

The timely-filed comments in response to notice of the parties' settlement agreement reflect a substantial sentiment in favor of the settlement.[4] As stated, of the 45 submissions, only nine are in the nature of objections, 10 are statements of support from consumer and advocacy organizations, 23 are letters of support from mental-health consumers and relatives, and three are too vague and generalized to categorize.

The objectors fall into three categories. First, three relatives of mental-illness or mental-retardation patients express alarm at the prospect of having their loved ones transferred from institutional facilities to community placements, fearing a reduced quality of care in the latter.[5] A second category consists of three objectors whose concerns either lack specificity or relate only generally to the issues in controversy.[6] The last category of objectors consists of three advocacy groups, and the court deems it appropriate to address their thoughtful concerns.

On behalf of the Patrons of Partlow, a support organization for 214 parents or guardians of Partlow residents, President William Haas first expresses a viewpoint with which the court and the parties cannot disagree: that the settlement should "promot[e] the best possible care and quality of life for the Partlow [and other plaintiff class] residents." His organization's chief objection is to the provision of the agreement that requires that "a specific number [300]" of "persons with mental retardation receiving services at the four state institutions will be transferred to community facilities" over the term of the agreement. His organization proposes that the number, 300, be replaced with this: "those individuals who would benefit from community placement in terms of receiving care, services, and security that are better than that which they are currently receiving in an institution." [7]

Vandy J. Copeland, the second objector, is parent of a resident at Tarwater as well as president of two support groups, Friends of Tarwater and Advocates for the Retarded. His objection, which he characterized at the fairness hearing as a "concern" rather than a true "objection," echoes those of Mr. Haas. Believing that many residents of Tarwater receive excellent and appropriate services in that institution, Copeland is concerned about the push toward outplacement, and seeks "guidelines and protection" to ensure the safety of mental-health consumers and the appropriate use of the projected census reduction in state facilities.[8]

In contrast to Haas and Copeland, who worry about the over-use of community placement, the Arc of Morgan County—an 180–member advocacy organization for persons with mental retardation and developmental disabilities—complains that the settlement should address community placement for all 650 mental-retardation residents rather than only the 300 targeted. An additional concern, shared by all three objectors, relates to the possibility that insufficient funding will doom the pro-

---

4. Also included in the parties' joint evidentiary submission are representative letters of support from a number of individuals and advocacy groups, including, but not limited to: R. Emmett Poundstone, III, a former Commissioner of, and a former legal counsel to, the Alabama Department of Mental Health and Mental Retardation; Ann Denbo, mother of a Bryce patient; Brenda Doss, President of The Arc of the United States; Friends of Bryce; Friends of Brewer Center; and Friends of the Wallace Center.

5. *See* Doc. no. 2108 (Carol E. Parker); Doc. no. 2082 (Reva Brown); Doc. no. 2100 (Emma Jean Coleman).

6. *See* Doc. no. 2062 ( Robert Landis Williams); Doc. no. 2074 (Mrs. Jerry Delk, mother of a mental health patient and an advocate for the seriously mentally ill, who advocates implementation of the "1994 Community Service Officer Act."); Doc. no. 2060 (Eugenia Roos, a disabled senior citizen generally concerned that institutionalized citizens may not be well-protected in the absence of the *Wyatt* standards and the *Wyatt* consent decree).

7. *See* Doc. No.2079.

8. *See* Doc. no. 2113.

jected census reduction in facilities and community placements, and transitional services.[9]

### C. *Judgment of Counsel*

 "In addressing whether a settlement is fair, adequate, and reasonable, a court should also consider the judgment of experienced counsel for the parties." *Paradise,* 686 F.Supp. at 1446. Here, counsel for the plaintiffs argue strongly in favor of approval of the settlement agreement, and their views carry great weight with the court. The plaintiffs' attorneys have a significant background in disability law, and especially in mental-health law. Each of the two attorneys who have been the plaintiffs' liaison counsel in the last 15 years has extensive experience in litigating, negotiating, and implementing structural reforms on behalf of individuals with disabilities in institutional settings. The parties' settlement counsel are also experienced counsel with reputable records in federal class-action litigation. No one has questioned in any manner these attorneys' dedication to the plaintiff class. Counsel for amicus curiae United States also supports the settlement agreement, and the court takes their views, supported by many years of experience in this type of litigation, very strongly into consideration.

### D. *Assessment of the Settlement Agreement*

 "Finally, with the above considerations in mind, the court should itself assess whether the consent decree is fair, adequate, and reasonable," *Paradise,* 686 F.Supp. at 1446, as well as legal. *See id.* at 1448. The court finds that the proposed settlement meets these standards. The agreement imposes requirements and provides avenues for the outplacement of Alabama's mental-health consumers into the community, while ensuring that such decisions are made on an individualized basis and with adequate safeguards of each consumer's health and safety. The agreement is supported by commitments from Governor Don Siegelman and Commissioner Sawyer to put the agreement in place and to secure the funding necessary to do so. The court is also reassured of the agreement's fairness by the role it affords both to the plaintiffs' families and guardians to participate in placement decisions for each patient, and to the plaintiffs' counsel to remain active in monitoring implementation efforts over the course of the next three years. Thus, while the court appreciates the concerns voiced by Mr. Haas and Mr. Copeland, the court is convinced by Commissioner Sawyer's representation that the figures of "300" in the settlement reflect a reasonable assessment of the number of patients that should be eligible for community placement and that the actual placement of a patient in a community facility will not be driven by numbers but rather will be based on an individual assessment and approved only when it is in the best interest of the patient. Finally, the court also finds that the settlement agreement complies with state and federal law.

## IV. CONCLUSION

For the foregoing reasons, the court concluded that the proposed settlement agreement is fair, adequate, and reasonable, and the joint motion for judicial approval of this agreement and termination of the litigation was granted. An appropriate judgment approving the settlement and granting the motion was, therefore, entered on May 5, 2000.

## APPENDIX A

### ORDER

Based upon the record in this case, including the representations made at the fairness hearing held on May 4, 2000, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) The objections to the proposed settlement agreement, entered by the parties on January 20, 2000 and submitted to the court on January 27, 2000, are OVERRULED.

---

9. *See* Doc. no.2080.

(2) The proposed settlement agreement, entered by the parties on January 20, 2000 and submitted to the court on January 27, 2000, is APPROVED and, in accordance with Section V–A of the settlement agreement, its effective date shall be deemed the date of this order.

(3) With the exception of the following matters over which the court shall retain jurisdiction, this lawsuit is DISMISSED, the September 22, 1986 consent decree is DISSOLVED with prejudice, including all of the *Wyatt* standards, and all prior orders and injunctions are also DISSOLVED with prejudice:

(a) The settlement agreement, which is approved by the court today, pursuant to which the court retains jurisdiction for the limited purpose of enforcement in accordance with the process specified in Section II of the agreement.

(b) The order and injunction entered on April 21, 1998 (Doc. no. 1695), pursuant to which the defendants "are enjoined and restrained from treating more than 74 individuals at the North Alabama Regional Hospital, more than 66 individuals at the Greil Memorial Psychiatric Hospital, and more than 122 individuals at Thomasville Mental Health Rehabilitation Center at any given time, with the defendants to retain the right to use additional beds in the respective facilities in the event of an emergency or crisis situation." Although the parties inadvertently failed to reference Thomasville in footnote one of the settlement agreement, they did reference it at page 29, and they have reaffirmed their intent and agreement that the April 21, 1998 order should remain in effect as to Thomasville as well.

(c) The order and injunction entered on December 9, 1998 (Doc. no. 1790), pursuant to which the defendants are "enjoined and restrained from expanding" S.D. Allen Intermediate Care Facility in Northport, Alice M. Kidd Intermediate Care Facility in Tuscaloosa, Claudette Box Nursing Facility in Mt. Vernon, and Mary Starke Harper Geriatric Psychiatry Center in Tuscaloosa, in order to accomplish any current or future long-term bed reductions at any mental illness facility.

A memorandum opinion will follow later.

## APPENDIX B
## SETTLEMENT AGREEMENT

### INDEX

I. SCOPE OF SETTLEMENT AGREEMENT ...............................1245
 A. PARTIES .......................................................1245
 B. PLAINTIFF CLASS .............................................1245
 C. FACILITIES ...................................................1246
 D. INTENT AND EFFECT............................................1246
 1. Final Resolution of all Controversies in Pending Litigation ...............1246
 2. No New Claims Created .........................................1247
 3. Cooperative Process to Govern ...................................1247
 4. New Framework for Evaluating Services to DMH/MR Consumers ........1247

II. OBLIGATIONS AND COMMITMENTS TO ENSURE MAINTENANCE OF MINIMUM CONSTITUTIONAL STANDARDS FOR ADEQUATE TREATMENT OF PERSONS WITH MENTAL ILLNESS AND ADEQUATE HABILITATION OF PERSONS WITH MENTAL RETARDATION..................................................................1248

A. FUNDING COMMITMENTS .........................................1248
B. JOINT DEVELOPMENT OF PUBLIC EDUCATION PLAN ..............1248
C. MAINTENANCE OF ACCREDITATION AND CERTIFICATION ........1248
D. COMMITMENT TO CONTINUOUS QUALITY IMPROVEMENT
 ("CQI") .......................................................1248
 1. Policy Commitment to Wyatt standards ...............................1248
 2. Maintenance of Continuous Quality Improvement Systems ................1249
 a. System Components for DMH/MR Facilities ........................1249
 b. System Components for Certified Community Providers...............1249
 c. Staffing and Training ........................................1249
 d. Participation in Development and Review of CQI Systems .............1249
E. COMMITMENT TO ADVOCACY PROGRAM .......................1250
 1. Policy Commitment to Advocacy Program ...........................1250
 2. Staffing and Training...........................................1250
 3. Participation in Development and Review of Advocac y Program ..........1250
F. SAFETY AND PROTECTION ......................................1250
 1. Investigations ...............................................1250
 a. Standard Operating Procedures .................................1250
 b. Timely Investigations .......................................1250
 c. Participation by Alabama Disabilities Advocacy Program ("ADAP")....1251
 2. Employee training ...........................................1251
 3. Safety Reviews ..............................................1251
 4. Notice and Reporting to ADAP of Special Incidents ....................1251
 5. Notice to Guardians of Consumers ...............................1252
G. TREATMENT AND HABILITATION .................................1252
 1. Treatment of Persons with Mental Illness ...........................1252
 a. Interdisciplinary Treatment Plans ..............................1252
 b. "Special Needs" Persons ....................................1252
 c. "Special Treatment" Needs ..................................1253
 2. Habilitation of Persons with Mental Retardation .....................1253
 a. Individualized Habilitation Plans ..............................1253
 b. Behavior Analysis Consultants ................................1254
H. COMMUNITY PLACEMENTS .....................................1254
 1. Persons with Mental Illness .....................................1254
 a. Identification, Development, and Certification of Community Place-
 ments, Providers, and Service Needs............................1254
 b. Census Reduction for extended-care beds in Mental Illness Facilities....1255
 c. Discharge Plans.............................................1256
 d. Notice to ADAP of Community Referrals and Placements .............1256
 e. Notice by ADAP of potential risk of serious harm ..................1256
 f. Permission for ADAP Review ..................................1257
 2. Persons with Mental Retardation .................................1257
 a. Identification, Development, and Certification of Community Resi-
 dential facilities, Providers, and Service Needs .....................1257
 b. Census Reduction for Mental Retardation Facilities..................1258
 c. Discharge plans ............................................1258
 d. Notice to ADAP of Community Referrals and Placement ..............1259
 e. Notice by ADAP of potential risk of serious harm ..................1259
 f. Permission for ADAP review ..................................1260
I. PARTICIPATION BY ADAP IN POLICY REVIEW ......................1260

III. COMPLIANCE AND RESOLUTION OF DISPUTES ........................1261
 A. Role of ADAP.................................................1261
 B. Cooperation between Defendants and Plaintiffs' Counsel ...................1261
 C. Process for Resolving Disputes ......................................1262

IV. ATTORNEYS' FEES AND COSTS .......................................1263

V. TERM OF SETTLEMENT AGREEMENT..................................1263

 A. EFFECTIVE DATE ...........................................1263
 B. JURISDICTION DURING TERM OF AGREEMENT ....................1263
 C. END OF AGREEMENT .......................................1263

VI. RELATION TO EXISTING CAUSES OF ACTION AND APPEALS. ..........1264
 A. DISTRICT COURT ..........................................1264
 B. COURT OF APPEALS .......................................1265

## APPENDIX

| APPENDIX PAGE NO. | DESCRIPTION |
|---|---|
| 1—4 | Incorporation of Wyatt Standards in Policy Manual for the Alabama Department of Mental Health and Mental Retardation |

## SETTLEMENT AGREEMENT

### I.

In consideration of the mutual covenants contained in this Agreement, the Parties agree as follows:

### SCOPE OF SETTLEMENT AGREEMENT

### A. PARTIES

This Settlement Agreement is made and entered into by and between the Plaintiff class, and the State of Alabama Defendants, each by authorized representatives, as follows:

1. For the Plaintiff Class, *"Ricky Wyatt, by and through his aunt and legal guardian, Mrs. W.C. Rawlins, Jr., et al."* (hereinafter referred to as "Plaintiffs" or "plaintiff class"):

Counsel with the Alabama Disabilities Advocacy Program (hereinafter referred to as "ADAP" or "Plaintiffs' Counsel"), by James A. Tucker, Associate Director.

2. For the Defendants, *"Kathy Sawyer, as Commissioner of Mental Health and Mental Retardation, et al.,"* their respective officers, agents, employees, assigns, and successors *(hereinafter referred to as "Defendants")*:

Kathy Sawyer, Commissioner of the Alabama Department of Mental Health and Mental Retardation;

Courtney W. Tarver, Deputy Attorney General and General Counsel for the Alabama Department of Mental Health and Mental Retardation;

Don Siegelman, Governor of the State of Alabama;

and

Bill Pryor, Attorney General for the State of Alabama.

### B. PLAINTIFF CLASS

For the term of this Agreement, and for all purposes associated with the execution, implementation, and enforcement of this Settlement Agreement, Plaintiffs and Defendants (hereinafter referred to as "the Parties") stipulate as follows concerning the scope of the plaintiff class:

1. The plaintiff class represented by *"Ricky Wyatt, et al."* shall be defined in accordance with the District Court's ruling which re-certified the plaintiff class, as follows:

*"A plaintiff class consisting of all current and future mentally-retarded and mentally-ill residents of any facility, hospital, center, or home, public or private, to which they are assigned or transferred for residence by the Alabama Department of Mental Health and Mental Retardation, ... pursuant to Fed.R.Civ.P. 23(a) & (b)(2), Wyatt v. Rogers, 985 F.Supp. 1356, 1381 (M.D.Ala.1997), citing Wyatt v. Poundstone, 169 F.R.D. 155 (M.D.Ala.1995) (Thompson, J.)."*

The Parties acknowledge that members of the plaintiff class include persons who are "current and future mentally-retarded and mentally-ill residents" of any state psychiatric facilities or state developmental centers. The Parties further acknowledge that the plaintiff class includes persons who have been transferred or assigned by the Alabama Department of Mental Health and Mental Retardation ("DMH/MR") from a state psychiatric facility or a state

developmental center to a DMH/MR-certified home—whether public, private, for profit, or nonprofit. The plaintiff class does not include persons in their private homes or in the private homes of their family members, next friends, or guardians.

Members of the plaintiff class—whether they are patients with mental illness, clients or residents with mental retardation—are referred to, throughout this settlement agreement, as "consumers" of the DMH/MR.

2. Members of the plaintiff class do not include persons assigned for evaluation, treatment, or residency at the Taylor Hardin Secure Medical Facility ("Taylor Hardin"), which is the state's primary forensic evaluation, acute, and long-term care facility for persons either charged with or convicted of crimes. This Facility is not subject to the Wyatt Consent Decree and the Wyatt Standards. The Parties acknowledge, however, that persons at Taylor Hardin are members of the plaintiff class if DMH/MR has transferred or assigned them for residence at Taylor Hardin from a state psychiatric hospital or a state developmental center which is covered by this Agreement.

### C. FACILITIES

This Settlement Agreement is intended to apply to, and govern, the treatment and habilitation of all class members and the operations of all of the state-operated mental illness ("MI") and mental retardation

("MR") facilities which are still subject to this District Court's jurisdiction, as follows: [1]

*1. Psychiatric Facilities for Persons with Mental Illness—(3)*

Bryce Hospital ("Bryce")—Tuscaloosa
Searcy Hospital ("Searcy")—Daphne
and Mt. Vernon Thomasville Mental Health Rehabilitation Center ("Thomasville")—Thomasville.

*2. Developmental Centers for Persons with Mental Retardation (4)*

Lurleen B. Wallace Developmental Center ("Wallace")—Decatur
W.D. Partlow Developmental Center ("Partlow")—Tuscaloosa
Albert P. Brewer Developmental Center ("Brewer")—Mobile
J.S. Tarwater Developmental Center ("Tarwater")—Wetumpka.

### D. INTENT AND EFFECT

### 1. Final Resolution of all Controversies in Pending Litigation

The parties intend that this Settlement Agreement finally resolve all remaining issues in controversy between them. Such issues include, without limitation, the "mental illness" and "mental retardation" phases of this litigation in the U.S. District Court for the Middle District of Alabama (Civil Action No. 70–T–3195–N) and the litigation in the U.S. Court of Appeals for

---

1. Pursuant to Order and Injunction filed April 21, 1998 ( Doc. No. 1695), Greil Memorial Psychiatric Hospital, in Montgomery, and North Alabama Regional Hospital, in Decatur, have been released "from under the 1986 Consent Decree and all court orders affecting the two hospitals," subject only to the establishment of " census caps" on patient populations at the two hospitals [those census caps are described in this Agreement at Section II–H–1(b) ]. Pursuant to December 9, 1998 Order and Injunction (Doc. No. 1790), the S.D. Allen Intermediate Care Facility, in North-

port, the Alice M. Kidd Intermediate Care Facility, in Tuscaloosa, the Claudette Box Nursing Facility, in Mt. Vernon, and the Mary Starke Harper Geriatric Psychiatry Center, in Tuscaloosa, were also released "from the 1986 Consent Decree and this court's other orders." Defendants were "enjoined and restrained from expanding any of these four state-operated nursing homes in order to accomplish any current or future long-term bed reductions at any mental illness facility operated by the Department of Mental Health and Mental Retardation."

the Eleventh Circuit (Case Nos. 98–6038, 98–6441, 99–13457–A, and 99–14128–I).

The Parties also intend that this Agreement shall be a full, final, and legally binding settlement of all claims, demands, causes of actions, and matters which have been asserted or which might have been asserted in this litigation relating to the remaining disputed issues of compliance with the *Wyatt Consent Decree,* as follows:

1. Those Wyatt MI and MR Standards which remain in effect, through Paragraph 6 of the 1986 Consent Decree, at these facilities:

 a. Bryce and Searcy Hospitals: MI Standards 1, 2, 6, 7, 19, 19A, 26, and 34;

 b. Thomasville Mental Health Rehabilitation Center MI Standards 1, 2, and 34; and;

 c. Brewer, Partlow, Tarwater, and Wallace Developmental Centers MR Standards 1, 2, 3, 10, 11, 12, 15, 16, 22(c), 22(d), 34(b), 35, 37, 41, 43, 47, 49.

2. Paragraphs 7, 9, and 11 of the 1986 Consent Decree.

### 2. No New Claims Created

a. It is not the intent of this Agreement, and the Parties expressly agree that this Agreement shall not be construed, to create any basis or authorization for Plaintiffs to assert, or litigate, in this case any claims arising from or relating to the quality, sufficiency, or constitutionality of community-based treatment, habilitation, or care provided by DMH/MR to members of the Plaintiff Class during the term of this Agreement. It is further understood and agreed, however, that ADAP, or its successor as Counsel for the Plaintiff Class, may notify DMH/MR of potential risk of serious harm to any such member of the Plaintiff class, pursuant to the provisions of Section II–H–1–e and Section II–H–2–e, and ADAP may protect the interests of such class member at risk of serious harm in accordance with the specific require-

ments of those provisions and Section III–C–2.

b. Section II–D–1 of this Agreement acknowledges Defendants' commitment to maintain, adhere to, and implement those policies in the DMH/MR Policy and Procedures Manual (such policies being specifically identified herein at Appendix 1 through Appendix–4) which have incorporated compliance mechanisms and structures related to client treatment, care, rights, and services required by Paragraph 6 of the 1986 Consent Decree and Wyatt's minimum constitutional standards for adequate treatment of persons with mental illness and for adequate habilitation of persons with mental retardation. It is not the intent of Section II–D–1 or any other provision in this Agreement, and the Parties expressly agree that neither this Section nor any other provision in this Agreement shall be construed, to create any basis or authorization for Plaintiffs to assert, or litigate, in this case, any claims arising from or relating to policies or procedures included in the DMH/MR Policy and Procedures Manual other than those set forth at Appendix–1 through Appendix–4.

### 3. Cooperative Process to Govern

This Agreement contemplates a cooperative process between the Parties to assure the provision of appropriate treatment, habilitation, and care for citizens with mental illness or mental retardation. The Parties intend that the implementation of this Agreement be accomplished in a spirit of cooperation rather than an adversarial process.

### 4. New Framework for Evaluating Services to DMH/MR Consumers

The purpose of this Agreement is to memorialize all obligations and commitments that the Parties agree to undertake as well as the duties, rights and remedies they mutually acknowledge. Upon judicial approval, this Agreement—instead of the

Wyatt Standards and the Wyatt Consent Decree—shall provide the framework for evaluating the state's treatment of, and delivery of services to, persons with mental illness and persons with mental retardation. It shall supersede all existing standards, consent decrees, and orders, except for the District Court's April 21, 1998 Order and Injunction (Doc. No. 1695) imposing a limit on the number of individuals to be served at Thomasville, Greil, and North Alabama Regional Hospital [see Section II–H–1(b) of this Agreement] and the District Court's December 9, 1998 Order and Injunction (Doc. No. 1790), enjoining the expansion of the four state-operated nursing homes in order to accomplish future long-term bed reductions at Defendants' mental illness facilities.

## II.

## OBLIGATIONS AND COMMITMENTS TO ENSURE MAINTENANCE OF MINIMUM CONSTITUTIONAL STANDARDS FOR ADEQUATE TREATMENT OF PERSONS WITH MENTAL ILLNESS AND ADEQUATE HABILITATION OF PERSONS WITH MENTAL RETARDATION

### A. FUNDING COMMITMENTS

The Commissioner and the Governor shall apply their diligent, determined, and best efforts to secure such legislative appropriations or other funding allocations as are reasonably necessary to implement, in a timely and adequate fashion, all of the obligations and commitments herein undertaken by Defendants and the Alabama Department of Mental Health and Mental Retardation. The Commissioner's and Governor's commitment to use their best efforts to secure reasonably necessary monies comprise a significant consideration for Plaintiffs' consent to this Settlement Agreement; consequently, the Parties acknowledge Plaintiffs' reasonable expectation that the Commissioner will seek funding commitments promptly after the effective date of this Agreement, and, in no event, later than the first regular session of the Alabama Legislature scheduled thereafter.

Notwithstanding the foregoing, the Parties stipulate that any failure by the Legislature to appropriate the necessary funding shall not alone be a sufficient basis for an action by Plaintiffs for breach of this settlement agreement; nor shall the failure to secure legislative appropriations alone excuse Defendants from any of the obligations of this Agreement.

### B. JOINT DEVELOPMENT OF PUBLIC EDUCATION PLAN

Plaintiffs and Defendants shall cooperate to develop and implement a comprehensive, statewide Plan which is designed to enhance the public's appreciation for the abilities, rights, and needs of persons with mental illness and persons with mental retardation who are served by Defendants. The Parties shall aim to educate not only the general public but also the DMH/MR consumers, their families, and guardians. The Plan shall be developed within six months after the effective date of this Agreement, and it shall be implemented in a timely fashion thereafter.

### C. MAINTENANCE OF ACCREDITATION AND CERTIFICATION

All of the DMH/MR's mental illness facilities are accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), and all of the DMH/MR's developmental centers are certified by the Health Care Financing Administration ("HCFA")/Title XIX. Defendants shall maintain JCAHO accreditation and HCFA/Title XIX certification for all state facilities subject to this Agreement.

### D. COMMITMENT TO CONTINUOUS QUALITY IMPROVEMENT ("COI")

*1. Policy Commitment to Wyatt Standards*

As shown at Appendix–1 through Appendix–4, Defendants have incorporated into the DMH/MR Policy and Procedures Manual (hereinafter, "DMH/MR Policy Manual") compliance mechanisms and structures related to client treatment, care, rights, and services required by Paragraph 6 of the 1986 Consent Decree and *Wyatt*'s minimum constitutional standards for adequate treatment of persons with mental illness and for adequate habilitation of persons with mental retardation.

During the term of this Agreement, Defendants shall maintain said system-wide policy commitment to these minimum constitutional standards; further, Defendants shall continue to require that all DMH/MR facilities utilize the DMH/MR Policy Manual and expressly adhere to and implement all of these policies, as referenced in Appendix–1 through Appendix–4.

## 2. Maintenance of Continuous Quality Improvement Systems

Defendants shall continue to operate their DMH/MR Continuous Quality ("CQI")Improvement Systems in order to monitor the quality of mental health and mental retardation services provided to persons served in state-operated psychiatric facilities and developmental centers. The systems shall include consumer-oriented and person-centered outcome standards.

### a. System Components for DMH/MR facilities

Defendants' CQI systems currently include the following components:

(i) **Quality Assurance:** activities to maintain compliance with applicable standards for accreditation and certification.

(ii) **Quality Indicators:** data necessary to measure each facility's performance in achieving specified outcomes for consumers.

(iii) **Incident Prevention and Management System:** requirements for reporting, investigating, reviewing, and correcting special incidents involving consumers.

(iv) **Consumer/Family Satisfaction Survey:** tools for input from consumers and their families regarding factors which impact the care and treatment of consumers.

(v) **Utilization Review:** reviews of individual records necessary to maintain accreditation and certifications.

### b. System Components for certified community providers

Defendants shall continue to require that DMH/MR-certified community providers operate and maintain their Quality Improvement Systems. DMH/MR shall review and monitor such systems periodically to ensure that each is functional and that each includes components of Quality Assurance, Quality Indicators, Incident Prevention and Management, Consumer/Family Satisfaction Survey, and Utilization Review, as these components are described in the above-stated requirements for DMH/MR facilities.

### c. Staffing and Training

Defendants shall maintain at least one full-time CQI employee in the MI divisional office, in the MR divisional office, and at each facility. Defendants shall ensure that all CQI staff complete training necessary to implement and maintain the CQI system.

### d. Participation in Development and Review of CQI Systems

Defendants shall provide meaningful opportunities for input concerning the operation and improvement of the DMH/MR CQI systems from consumers, family members, community providers, consumer groups, advocacy organizations, and advocates.

To ensure meaningful participation by representatives of the plaintiff class in the CQI systems, Defendants shall allow ADAP's designated representative to serve in an ex-officio, non-voting capacity on the CQI committees at the state/divisional levels and on each facility's CQI committee; in such capacity, the ADAP representative shall be bound by all Committee rules and procedures, including, but not limited to, the requirement of confidentiality for Committee proceedings.

### E. COMMITMENT TO ADVOCACY PROGRAM

#### 1. Policy Commitment to Advocacy Program

Defendants have developed and operated an internal Advocacy Program, and the DMH/MR Policy Manual fully incorporates this Program's missions and services. The Advocacy Program is designed to educate persons about client rights, to review and/or investigate complaints of rights violations, and to monitor conditions in state mental health and mental retardation facilities and in certified community programs. During the term of this Agreement Defendants shall continue to maintain this systemwide Advocacy Program and to review the Program periodically to ensure its effective operation.

#### 2. Staffing and Training

During the term of this Agreement, Defendants shall maintain a staff of at least 26 full-time equivalent advocates. Defendants shall ensure that the Advocacy staff, including all of the full time equivalent advocates, complete training necessary to implement and maintain an effective Advocacy Program.

#### 3. Participation in Development and Review of Advocacy Program

Defendants shall provide meaningful opportunities for input concerning the operation and improvement of the Advocacy Program from consumers and family members, community providers, consumer groups, and advocacy organizations.

To ensure meaningful participation by representatives of the plaintiff class in the Advocacy Program, Defendants shall allow ADAP's designated representative to serve in an ex-officio, non-voting capacity on the state's Advocacy Advisory Board and on each facility's Advocacy Advisory Committee; in such capacity, the ADAP representative shall be bound by all Advisory Board and Advisory Committee rules and procedures, including, but not limited to, the requirement of confidentiality for Committee proceedings.

### F. SAFETY AND PROTECTION

#### 1. Investigations

##### a. Standard Operating Procedures

Defendants shall continue to implement standard operating procedures for investigating and responding to allegations of abuse and neglect in mental health and mental retardation facilities. During the term of this Agreement the current procedures and policies, including those in DMH/MR Policy No. 19–10, shall be adhered to and periodically reviewed. These policies and procedures shall be modified as warranted, pursuant to Departmental policy and pursuant to this Agreement. Defendants shall also continue, during the term of this Agreement, to adhere to, review, and modify as warranted, the current procedures and policies for timely and adequate investigations of and responses to abuse and neglect in DMH/MR-certified community placements.

##### b. Timely Investigations

Defendants shall initiate investigations of abuse and neglect immediately after their reported occurrence in a mental health or a mental retardation facility, and they shall complete such investigations within 30 days after the report.

All investigations involving consumers which have been pending for more than 30 days shall be reported to ADAP on a monthly basis.

### c. Participation by Alabama Disabilities Advocacy Program

DMH/MR shall allow ADAP's designated representative to serve in an ex-officio, non-voting capacity on each facility's Investigation Review Committee; in such capacity, the ADAP representative shall be bound by all Committee rules and procedures, including, but not limited to, the requirement of confidentiality for Committee proceedings.

### 2. Employee Training

Defendants agree to continue training its employees regarding departmental policies which require the timely reporting of allegations of abuse and neglect. ADAP and the Commissioner's designated representative agree to cooperate in jointly developing and presenting training regarding the requirements, rights, and remedies in federal and state "whistle blower" statutes to all merit and contract employees at the four mental retardation and the three mental health facilities. Defendants pledge their good-faith efforts to facilitate employees' attendance at scheduled training programs.

### 3. Safety Reviews

During the term of this Agreement Defendants shall continue their consultation with Labor Relations Alternatives, Inc. ("LRA"), or with other qualified professionals as necessary within Defendants' discretion, regarding safety review for residents of mental retardation facilities. Consultation on these matters may include: evaluation of new procedures regarding staffing needs, including the deployment and adequacy of staff; staff training, supervision, ratios, and additional procedures. Defendants shall provide to ADAP quarterly status reports describing the substance of the consultants' recommendations, responses by DMH/MR, and any DMH/MR implementation of those recommendations.

### 4. Notice and Reporting to ADAP of Special Incidents

a. During the term of this Agreement Defendants shall provide to ADAP written notice of all "special incidents" involving DMH/MR consumers in any of the seven mental health and mental retardation facilities covered by this Agreement. Pursuant to DMH/MR Policy No. 19–70, "special incident" is defined for this purpose as "...death; major personal injury...; · suspected..neglect, mistreatment, exploitation or abuse; suspected sexual assault." Consistent with the classifications of severity of injuries utilized in the DMH/MR Incident Prevention and Management System, a "major personal injury" for purposes of this requirement is "a serious injury, including any fracture, head injury, or wound requiring suturing (more than five sutures)."

b. For all special incidents other than deaths, which involve DMH/MR consumers in any of the seven mental health and mental retardation facilities covered by this Agreement, Defendants shall provide to ADAP on a monthly basis a written report which shall include the following:

(i) an alphabetized listing of the affected DMH/MR consumers;

(ii) a description of the "special incidents"; and

(iii) a summary of DMH/MR action in response to each special incident.

c. For special incidents which result in the death of a DMH/MR consumer in any of the seven mental health and mental retardation facilities covered by this Agreement, when there is reason to believe that such death was due to causes other than natural, Defendants shall provide to ADAP not later

than 14 days after the death occurs, a written report which shall include the following:

(i) the name, age, and cause of death, of the deceased;

(ii) the name, physical address, and mailing address of the parent, guardian, next-friend, or next-of-kin of the deceased;

(iii) the date, time, and place of death; and

(iv) whether an internal investigation has been undertaken. Upon completion of any such DMH/MR internal investigation of the death of a consumer, Defendants shall also provide to ADAP, not later than 14 days after completion of the investigation, an investigative summary which shall include the following:

(i) a description of the incident which resulted in the death;

(ii) the name of the alleged perpetrator, if applicable;

(iii) the investigative findings;

(iv) the name of the DMH/MR investigator; and

(v) any DMH/MR plan of action in response to the incident resulting in the death.

**5. *Notice to Guardians of Consumers***

During the term of this Agreement Defendants shall continue to notify Guardians of Consumers of special incidents pursuant to the policies and procedures in the DMH/MR Policy Manual.

**G. *TREATMENT AND HABILITATION***

**1. TREATMENT OF PERSONS WITH MENTAL ILLNESS**

**a. Interdisciplinary Treatment ("IDT") Plans**

DEVELOPMENT: Defendants shall continue to conduct interdisciplinary team meetings and to develop individualized treatment plans for each person residing at Bryce, Searcy, and Thomasville. Qualified Mental Health Professionals will continue to assess each person's programs at least monthly and to revise the individual treatment plan as needed.

REVIEW: A review of the IDT process, also to include the implementation of treatment services, will be conducted by the facility's CQI staff, and others as appointed by the *facility Director*, to assure adequacy and appropriateness of the process and of the treatment received by each individual.

ADAP INPUT: During the term of this Agreement, ADAP shall receive monthly notice of all scheduled IDT meetings at each of the MI facilities. ADAP shall be invited to attend all IDT meetings. ADAP may attend any IDT meetings absent an objection by the consumer, provided that the consumer has the requisite capacity to make an informed decision. If the consumer lacks such capacity, his parent or guardian may make the decision, and ADAP shall be supplied with the name and address of the parent or guardian. ADAP shall be authorized to communicate with a consumer who has the requisite capacity or with the parent or guardian of a consumer who lacks the requisite capacity in order to verify the objection and to identify and address the basis for the objection. If a consumer lacks capacity and has no parent or guardian, then ADAP shall be allowed to attend the IDT meeting.

**b. "Special Needs" Persons**

Within nine months after the effective date of this Agreement Defendants shall retain one or more qualified professional consultants, who shall conduct a comprehensive study of, and provide written recommendations concerning, DMH/MR policies and procedures regarding treatment and discharge plans for:

(i) all consumers who are 18 years of age and younger;

(ii) all adult consumers in state mental health facilities who have any of the following diagnoses: a dual diagnosis of mental illness and mental retardation; traumatic brain injury; organic brain injury; self-injurious behavior; HIV/AIDS/ARC; deafness, blindness, or serious physical impairments as defined by Defendants.

Defendants and their professional consultant(s) shall confer with ADAP to identify its concerns about these policies and procedures. Each professional study shall be completed within six months of the consultant's retainer. ADAP shall be provided copies of any reports and recommendations by the consultants. ADAP shall be provided an opportunity to confer with the Commissioner concerning DMH/MR implementation of consultants' recommendations and any policy modifications in response to such recommendations. The parties acknowledge that the Commissioner shall retain discretion, pursuant to Departmental policy, concerning the adoption of any proposed recommendations or policy modifications.

#### c. "Special Treatment" Needs

Within nine months after the effective date of this Agreement Defendants shall retain one or more qualified professional consultants, who shall conduct a comprehensive study of, and provide written recommendations concerning, DMH/MR practices regarding:

(i) the use of seclusion and restraint for consumers with self-injurious behavior at Bryce and Searcy;

(ii) the use and administration of psychiatric medications to consumers, to include, but not be limited to, the following concerns: monitoring of patients on psychiatric medication for unnecessary, excessive, or inappropriate administrations; administration of psychiatric medication as punishment or as a substitute for treatment;

proper documentation for the use of, and changes in, such psychiatric medication.

Defendants and their professional consultant(s) shall confer with ADAP to identify its concerns about these practices. Each professional study shall be completed within six months of the consultant's retainer. ADAP shall be provided copies of any reports and recommendations by the consultants. ADAP shall be provided an opportunity to confer with the Commissioner concerning DMH/MR implementation of consultants' recommendations and any policy modifications in response to such recommendations. The parties acknowledge that the Commissioner shall retain discretion, pursuant to Departmental policy, concerning the adoption of any proposed recommendations or policy modifications.

### 2. HABILITATION OF PERSONS WITH MENTAL RETARDATION

#### a. Individualized Habilitation Plans (IHP)

DEVELOPMENT: Defendants shall continue to conduct individualized habilitation team meetings and to develop individualized habilitation plans for each person residing at Wallace, Partlow, Brewer, and Tarwater. Qualified Mental Retardation Professionals will continue to assess each person's programs at least monthly and to revise the individualized habilitation plan as needed.

REVIEW: A review of the IHP process, also to include the implementation of habilitation services, will be conducted by the facility's CQI staff, and others as appointed by the facility Director, to assure adequacy and appropriateness of the process and of the habilitation received by each individual.

ADAP INPUT: During the term of this Agreement, ADAP shall receive monthly notice of all scheduled IHP meetings at

each of the MR facilities. ADAP shall be invited to attend all IHP meetings. ADAP may attend any IHP meetings absent an objection by the consumer, provided that the consumer has the requisite capacity to make an informed decision. If the consumer lacks such capacity, his parent or guardian may make the decision, and ADAP shall be supplied with the name and address of the parent or guardian. ADAP shall be authorized to communicate with a consumer who has the requisite capacity or with the parent or guardian of a consumer who lacks the requisite capacity in order to verify the objection and to identify and address the basis for the objection. If a consumer lacks capacity and has no parent or guardian, then ADAP shall be allowed to attend the IHP meeting.

**b. Behavior Analysis Consultant**

Within nine months after the effective date of this Agreement Defendants shall retain a Behavior Analysis Consultant, or such other qualified professional consultants as warranted, to assess and provide recommendations regarding both systemic and clinical matters relevant to the habilitation of persons with mental retardation. Consultation and recommendations shall concern the following matters:

a. Behavior analysis policies;

b. Functional assessment/analysis procedures and practices;

c. Staff training and supervision practices;

d. Data collection methods and practices;

e. Behavior Reduction/Replacement Behavior Planning;

f. Restraint and Time–Out Programs;

g. Crisis intervention procedures and systems; and

h. Psychotropic medication use, including how psychotropic medication and behavior analysis are integrated and managed. Defendants and their professional consultant(s) shall confer with ADAP to identify its concerns about these systemic and clinical matters. Each professional study shall be completed within six months of the consultant's retainer. ADAP shall be provided copies of any reports or recommendations by the consultants. ADAP shall be provided an opportunity to confer with the Commissioner concerning DMH/MR implementation of consultants' recommendations and any policy modifications in response to such recommendations. The parties acknowledge that the Commissioner shall retain discretion, pursuant to Departmental policy, concerning the adoption of any proposed recommendations or policy modifications.

## H. COMMUNITY PLACEMENTS

### 1. PERSONS WITH MENTAL ILLNESS

**a. Identification, Development, and Certification of Community Placements, Providers, and Service Needs**

*THREE–YEAR PLAN:* By September 1, 2000, Defendants shall develop a plan, to be implemented during the three-year period beginning on October 1, 2000 (fiscal year 2001), and ending on September 30, 2003 (fiscal year 2003), to identify consumers to be out-placed from mental health facilities and to increase community-based placements and community-based services for such consumers with mental illness. Such alternative placements and services shall be established before such a consumer is discharged from an MI facility.

*SCOPE OF PLAN:* Defendants' Plan shall:

● Identify by treatment professionals consumers for whom community-based placements could be appropriate;

- Honor the consumer's choice, or for a consumer who lacks capacity, the choice by his parent or guardian, to transfer to a less restrictive setting in the community;
- Consider the adequacy of the state's fiscal resources;
- Assess Defendants' systems and plans for discharge of consumers to community-based placements;
- Develop systemic and individualized services necessary to support discharge of consumers to community-based placements.

*CERTIFICATION:* Defendants shall continue to promulgate, review, and revise as necessary, minimum standards—as required by state law—for the certification of a community residential facility or a treatment program by a community service provider. Upon written request to the Commissioner, ADAP shall have access to DMH/MR certification reports of community service providers to whom a consumer has been assigned or transferred for residence or treatment by DMH/MR.

**b. Census Reduction for extended-care beds in Mental Illness Facilities**

*CENSUS REDUCTION:* While many consumers exhibiting severe psychiatric illness can receive the appropriate level of treatment in the community with proper supports, the parties acknowledge the continuing need for some extended-care treatment resources in state hospitals. *During the three-year period beginning on October 1, 2000 (fiscal year 2001), and ending on September 30, 2003 (fiscal year 2003), Defendants shall reduce the number of extended-care beds at Bryce, Searcy, and Thomasville by a total of 300.* Bed reduction pursuant to this requirement may not be achieved by increasing extended-care beds beyond the census caps described at Section I–C, note 1. In meeting Defendants' obligation to reduce extended-care beds, the Commissioner shall apply her diligent, determined, and best efforts to out-place consumers from mental health facilities and to increase alternatives for community-based placements and services.

*RETENTION OF CENSUS CAPS AT GREIL, NORTH ALABAMA REGIONAL HOSPITAL, AND THOMASVILLE:*

Pursuant to the District Court's April 21, 1998 Order and Injunction (Doc. No. 1695), "Defendants . . are enjoined and restrained 'from treating more than 74 individuals at the North Alabama Regional Hospital, more than 66 individuals at the Greil Psychiatric Hospital, and more than 122 individuals at Thomasville Mental Health Rehabilitation Center at any given time, with the defendants to retain the right to use additional beds in the respective facilities in the event of an emergency or crisis situation.'

For the term of this Agreement, ( as defined herein in Section V), Defendants shall retain the court-ordered census caps at these three facilities along with the court-approved right to use additional beds in these facilities in the event of an emergency or crisis situation, for a period of time equal to the length of the emergency event or crisis situation."

*NURSING HOME PLACEMENTS:* Defendants may discharge a consumer from a state mental health facility to a nursing home—including one of the DMH/MR-operated nursing homes or the state-operated geriatric facility—if such placement is supported by professional assessments and individualized planning and represents the best available choice for the consumer upon consideration of all relevant factors. Defendants shall give reasonable notice of the planned move to ADAP and the consumer's family and/or guardian, in accordance with HCFA Regulations.

*DMH/MR DISCRETION:* The requirements of this paragraph shall not be interpreted or applied to restrict, or undermine in any manner, Defendants' exercise of professional judgment and discretion to choose among professionally acceptable alternatives to reach the stipulated reduction.

### c. Discharge Plans

Defendants shall use professional assessments to develop a discharge plan for each consumer discharged from a state mental health facility. The discharge plan shall determine the maximally effective, efficient, and safe outplacement in the most integrated setting appropriate for the consumer's needs. The discharge plan shall identify community services consistent with the consumer's identified needs.

Regarding the discharge plan developed, Defendants shall document in each consumer's record the opinion of the IDT, any opinion and preferences of the consumer and/or his or her guardian, responsible party or next-friend, and as applicable, a representative of ADAP. Defendants shall make the final decision for each discharge plan.

Defendants shall provide to potential providers of community services a reasonable opportunity to review information and confer with the interdisciplinary treatment team ("IDT") regarding each discharge plan. Defendants shall continue to encourage such reviews and conferences.

During the term of this Agreement, ADAP shall receive monthly notice of all IDT meetings at Bryce, Searcy, and Thomasville, which are scheduled to develop discharge plans. ADAP will be invited to attend all such IDT meetings absent an objection by a consumer or by the parent or guardian of a consumer who lacks capacity.

ADAP shall be authorized to communicate with a consumer who has the requisite capacity or with the parent or guardian of a consumer who lacks the requisite capacity in order to verify the objection and to identify and address the basis for the objection. In the absence of a parent or guardian for a consumer who lacks capacity, Defendants shall permit ADAP to attend such consumer's IDT meeting.

The consumer or his guardian, responsible party or next-friend may appeal any disagreement with the IDT in accordance with written appeal procedures for the respective state facility. Notice of appeal rights and procedures shall be provided to the consumer, or his guardian, responsible party or next friend, at each IDT meeting.

### d. Notice to ADAP of Community Referrals and Placements

During the term of this Agreements Defendants shall provide to ADAP notice on a monthly basis of all consumers on referral to a community residential facility. Such notice shall include the consumer's name and the name of the community service provider to whom the consumer has been referred. During the term of this Agreement Defendants shall provide notice on a monthly basis to Plaintiffs' counsel of all consumers discharged from a state mental health facility to a community residential facility or to the private home of the consumer or of the consumer's family, next friend or guardian. Such notice shall include: (i) the consumer's name; (ii) the name of the community residential facility, or the consumer's home, family, next friend or guardian; and (iii) the mailing address, street address, and telephone number for the community residential facility or the consumer's home, family, next friend, or guardian. The final discharge plan shall be available for review at the respective facility by ADAP.

### e. Notice by ADAP of potential risk of serious harm

During the term of this Agreement, ADAP may notify the Commissioner, in writing, of potential risk of serious harm to any consumer.[2] For the purpose of

---

2. These provisions shall also apply to notice by ADAP of potential risk of serious harm to

this provision, "risk of serious harm" shall refer to an imminent threat to life or personal safety as a result of physical or emotional abuse, neglect, physical injury, sexual exploitation or sexual assault.

The notice to the Commissioner must contain the name and address of the consumer at risk of serious harm, the name and address of any involved community residential facility, community service provider, or other residence, a specific description of the risk of serious harm, and a suggested method of correction.

Upon receipt of such notice, DMH/MR shall conduct a review, within 48 hours, to determine if a risk of serious harm exists. A report of the review shall be submitted to ADAP within 48 hours thereafter. If DMH/MR determines that a risk of serious harm exists, the Defendants shall immediately take action to remove or eliminate the risk of harm to the consumer. If DMH/MR determines that a risk of serious harm exists, and that the community residential facility, community service provider, or DMH/MR cannot or will not eliminate the risk reasonably, the Defendants, in the exercise of their professional judgment pursuant to due consideration of the consumer's particular needs and circumstances, shall arrange for the consumer to be served at another community residential facility or community service provider which is certified by DMH/MR, or provide the consumer additional transitional services deemed necessary to remove or eliminate the risk of harm. If an alternative residence cannot be arranged promptly for the consumer, Defendants shall be authorized to place the consumer temporarily in a DMH/MR institutional facility, in lieu of permitting the consumer to continue in a community placement or other residence which poses a risk of serious harm.

If DMH/MR determines that a risk of serious harm does not exist, the Parties shall conduct good-faith discussions to resolve the dispute. If the Parties are unable to reach agreement on the issue within 14 days of provision of the report to ADAP, ADAP may file a motion in this case on behalf of the affected consumer to require DMH/MR to provide needed transitional services or to arrange for the consumer to be served at another community residential facility or community service provider which is certified by DMH/MR.

**f. Permission for ADAP review**

DMH/MR shall include language in its contracts with community service providers to allow each consumer who is discharged from a state mental health facility to a community residential facility, to authorize ADAP's review of his medical records and/or ADAP's tour of his community residential facility. For a consumer who lacks capacity to consent, his parent or guardian may make the decision. In the absence of a parent or guardian for a consumer who lacks capacity to consent, ADAP and plaintiffs' expert witness shall be permitted to confer with the consumer to evaluate his capacity to consent. If Plaintiffs' expert determines that the consumer has the requisite capacity to consent, then the consumer's decision will be binding; if Plaintiffs' expert determines that the consumer lacks capacity to consent, then ADAP shall be permitted to make the decision.

**2. PERSONS WITH MENTAL RETARDATION**

**a. Identification, Development, and Certification of Community Residential Facilities, Providers, and Service Needs**

any consumer who resides in a state psychiatric facility.

*THREE–YEAR PLAN:* By September 1, 2000, Defendants shall develop a plan, to be implemented during the three year period beginning on October 1, 2000 (fiscal year 2001), and ending on September 30, 2003 (fiscal year 2003), to identify consumers to be out-placed from mental retardation facilities and to increase community-based placements and community-based services for consumers with mental retardation. Such alternative placements and services shall be established before such a consumer is discharged from a mental retardation facility.

*SCOPE OF PLAN:* Defendants' Plan shall:

- Identify by habilitation professionals consumers for whom community-based placements could be appropriate;
- Honor the consumer's choice, or for a consumer who lacks capacity, the choice by his parent or guardian, to transfer to a less restrictive setting in the community;
- Consider the adequacy of the state's fiscal resources;
- Assess Defendants' systems and plans for discharge of consumers to community-based placements;
- Develop systemic and individualized services necessary to support discharge of consumers to community-based placements.

*CERTIFICATION:* Defendants shall continue to promulgate, review, and revise as necessary, minimum standards—as required by state law—for the certification of a community residential facility and for the provision of care and treatment by a community service provider. Upon written request to the Commissioner, ADAP shall have access to DMH/MR certification reports of community residential facilities and community service providers to whom a consumer has been transferred for residence or habilitation.

### b. Census Reduction for Mental Retardation Facilities

*CENSUS REDUCTION:* While many consumers exhibiting severe mental retardation can receive the appropriate level of treatment in the community with proper supports, the parties acknowledge the continuing need for some habilitation resources in the state's developmental centers. ***During the three-year period beginning on October 1, 2000 (fiscal year 2001) and ending on September 30, 2003 (fiscal year 2003), Defendants shall reduce the census at Wallace, Partlow, Brewer, and Tarwater by a total of 300.***

In meeting Defendants' obligation to reduce the census in mental retardation facilities, the Commissioner shall apply her diligent, determined, and best efforts to out-place consumers from such MR facilities and to increase community-based placements and services.

*NURSING HOME PLACEMENTS:* Defendants may discharge a consumer from a state developmental center to a nursing home—including one of the DMH/MR-operated nursing homes or the state-operated geriatric facility—if such placement is supported by professional assessments and individualized planning and represents the best available choice for the consumer upon consideration of all relevant factors. Defendants shall give reasonable notice of the planned move to ADAP and the consumer's family and/or guardian, in accordance with HCFA Regulations.

DMH/MR DISCRETION: The requirements of this paragraph shall not be interpreted or applied to restrict, or undermine in any manner, Defendants' exercise of professional judgment and discretion to choose among professionally acceptable alternatives to reach the stipulated reduction.

#### c. Discharge Plans

Defendants shall use professional assessments to develop a discharge plan for each consumer discharged from a state mental retardation facility. The discharge plan shall determine the maximally effective, efficient, and safe out-placement in the most integrated setting appropriate for the consumer's needs. The discharge plan shall identify community services consistent with the consumer's identified needs.

Regarding the discharge plan developed, Defendants shall document in each consumer's record the opinion of the IHP, any opinion and preferences of the consumer and/or his or her guardian, responsible party or next friend, and as applicable, a representative of ADAP. Defendants shall make the final decision for each discharge plan.

Defendants shall provide to potential providers of community services a reasonable opportunity to review information and confer with the IHP team regarding each discharge plan. Defendants shall continue to encourage such reviews and conferences.

During the term of this Agreement, ADAP shall receive monthly notice of all IHP team meetings at Wallace, Partlow, Tarwater, and Brewer, which are scheduled to develop discharge plans. ADAP will be invited to attend all such IHP team meetings absent an objection by a consumer, or by the parent or guardian of a consumer who lacks capacity. ADAP shall be authorized to communicate with a consumer who has the requisite capacity or with the parent or guardian of a consumer who lacks the requisite capacity in order to verify the objection and to identify and address the basis for the objection. In the absence of a parent or guardian for a consumer who lacks capacity, Defendants shall permit ADAP to attend such consumer's IHP team meeting.

The consumer or his guardian, responsible party or next-friend may appeal any disagreement with the IHP team, in accordance with written appeal procedures for the respective state facility. Notice of appeal rights and procedures shall be provided to the consumer, or his guardian, responsible party or next friend, at each IHP meeting.

#### d. Notice to ADAP of Community Referrals and Placements

During the term of this Agreement Defendants shall provide to ADAP notice on a monthly basis of all consumers on referral to a community residential facility. Such notice shall include the consumer's name and the name of the community service provider to whom the consumer has been referred.

During the term of this Agreement Defendants shall provide notice on a monthly basis to Plaintiffs' counsel of all consumers discharged from a state developmental center to a community placement or to the private home of the consumer or of the consumer's family, next friend or guardian. Such notice shall include: (i) the consumer's name; (ii) the name of the community residential facility, or the consumer's home, family, next friend or guardian; and (iii) the mailing address, street address, and telephone number for the community residential facility, or the consumer's home, family, next-friend, or guardian. The final discharge plan shall be available for review at the respective facility by ADAP.

#### e. Notice by ADAP of potential risk of serious harm

During the term of this Agreement, ADAP may notify the Commissioner, in writing, of potential risk of serious harm to any consumer.[3] For the purpose of this provision, "risk of serious harm"

3. These provisions shall also apply to notice by ADAP of potential risk of serious harm to any consumer who resides in a state developmental center.

shall refer to an imminent threat to life or personal safety as a result of physical or emotional abuse, neglect, physical injury, sexual exploitation or sexual assault.

The notice to the Commissioner must contain the name and address of such consumer at risk of serious harm, the name and address of any involved community residential facility or community service provider, a specific description of the risk of serious harm, and a suggested method of correction.

Upon receipt of such notice, DMH/MR shall conduct a review, within 48 hours, to determine if a risk of serious harm exists. A report of the review shall be submitted to ADAP within 48 hours thereafter. If DMH/MR determines that a risk of serious harm exists, the Defendants shall immediately take action to remove or eliminate the risk of harm to the consumer. If DMH/MR determines that a risk of serious harm exists, and that the community residential facility, community service provider, or DMH/MR, cannot or will not eliminate the risk reasonably, the Defendants, in the exercise of their professional judgment pursuant to due consideration of the consumer's particular needs and circumstances, shall arrange for the consumer to be served at another community residential facility or community service provider which is certified by DMH/MR, or provide the consumer additional services deemed necessary to remove or eliminate the risk of harm. If an alternative residence cannot be arranged promptly for the consumer, Defendants shall be authorized to place the consumer temporarily in a DMH/MR institutional facility, in lieu of permitting the consumer to continue residence in a community placement or other residence which poses a risk of serious harm.

If DMH/MR determines that a risk of serious harm does not exist, the Parties shall conduct good-faith discussions to resolve the dispute. If the Parties are unable to reach agreement on the issue within 14 days of provision of the report to ADAP, ADAP may file a motion in this case on behalf of the affected consumer to require DMH/MR to provide needed transitional services or to arrange for the consumer to be served at another community residential facility or community service provider which is certified by DMH/MR.

### f. Permission for ADAP review

DMH/MR shall include language in its contracts with community service providers to allow each consumer who is discharged from a state developmental center to a community placement, to authorize ADAP's review of his medical records and/or ADAP's tour of his community residential facility. For a consumer who lacks capacity to consent, his parent or guardian may make the decision. In the absence of a parent or guardian for a consumer who lacks capacity to consent, ADAP and plaintiffs' expert witness shall be permitted to confer with the consumer to evaluate his capacity to consent. If Plaintiffs' expert determines that the consumer has the requisite capacity to consent, then the consumer's decision will be binding; if Plaintiffs' expert determines that the consumer lacks capacity to consent, then ADAP shall be permitted to make the decision.

### I. PARTICIPATION BY ADAP IN POLICY REVIEW

A. During the term of this Agreement Defendants shall continue to review periodically—at intervals not greater than two years—all of the DMH/MR policies which address the rights, safety and protection of DMH/MR consumers. Currently, these policies are reflected in the DMH/MR policy manual as follows:

| Policy No. | Description |
|---|---|
| 19–10 | Abuse of Clients |
| 19–20 | Reporting of Sexual Abuse |
| 19–25 | Reporting Abuse, Neglect, and Exploitation to the Department of Human Resources |
| 19–70 | Notification of Special Incidents |
| 20–22 | Civil and Legal Rights |
| 20–24 | Informed Regarding Rights |
| 20–26 | Due Process |
| 20–32 | Education |
| 20–38 | Safe and Humane Environment |
| 20–40 | Protection from Harm |
| 20–42 | Privacy/Confidentiality |
| 20–46 | Personal Possessions |
| 20–48 | Communication and Social Contacts |
| 20–50 | Religion |
| 20–52 | Confidentiality of Records |
| 20–56 | Labor |
| 20–58 | Disclosure of Services Available |
| 20–62 | Quality Treatment |
| 20–64 | Individualized Treatment/Habilitation |
| 20–66 | Participation in Planning Treatment/Habilitatio |
| 20–68 | Least Restrictive Conditions |
| 20–70 | Research and Experimentation |
| 20–72 | Informed Consent |
| 20–74 | Recipient's Responsibility |
| 330–5 | Client Records: Confidentiality |
| 430–5 | Patient Seclusion and Restraint |
| 430–20 | Informed Consent for Psychiatric Medications |
| 530–10 | Informed Consent for Certain Psychiatric Medications |

B. During the term of this Agreement Defendants shall provide to ADAP (i) reasonable prior notice of DMH/MR's review of these policies which address the rights, safety and protection of DMH/MR consumers; (ii) an opportunity to provide written and/or oral comments and recommendations regarding the policies being reviewed and any proposed modifications; (iii) notice of any proposed modification in any of these policies before such policy is officially approved and adopted. Notwithstanding the foregoing provisions for ADAP's participation in policy review, the Parties understand and hereby reaffirm that DMH/MR shall retain its statutory right, duty, and final authority to adopt and promulgate policies. For the purpose of this Agreement, such policies shall not be inconsistent with Defendants' obligations and commitments.

## III. COMPLIANCE AND RESOLUTION OF DISPUTES

No court-appointed monitor or committee, or any other formal system of monitoring, shall be implemented for this Settlement Agreement.

### A. ROLE OF ADAP

Pursuant to its status and mission, and its role as Plaintiffs' Counsel in this case, ADAP, or its successor as Plaintiffs' Counsel, shall evaluate, and, if necessary, take appropriate action pursuant to Section III–C to secure, Defendants' compliance with this Agreement during the term of the Settlement Agreement. As particularized below, the Parties shall cooperate to accommodate such evaluation reasonably in an effort to promote their shared interests in achieving the outcomes required in this Agreement while minimizing, and promptly resolving, any compliance disputes which may arise during the term of this Agreement.

### B. COOPERATION BETWEEN DEFENDANTS AND PLAINTIFFS' COUNSEL

Defendants agree to cooperate reasonably with ADAP, or successor Plaintiffs' Counsel, to facilitate, as follows, such access and communications as may be warranted to evaluate Defendants' obligations and commitments during the term of this Agreement:

1. Developing and maintaining a line of periodic communications between ADAP and the Commissioner, or her designated representatives, for the purpose of facilitating problem-solving and information sharing, and including quarterly status conferences to update Defendants' progress in connection with the obligations and commitments in this Agreement.

2. Reasonable access by ADAP to Defendants' three mental health and

four mental retardation facilities, and to such of Defendants' non-executive staff, and DMH/MR consumer records or documents as may be necessary to evaluate and implement the purposes, obligations, and requirements specified in this Agreement at Section II–D (Commitment to Continuous Quality Improvement), Section II–E (Commitment to Advocacy Program), Section II–F (Safety and Protection), Section II–G (Treatment and Habilitation), Section II–H (Community Placements) and Section II–I (ADAP Participation in Policy Review).

## C. *PROCESS FOR RESOLVING DISPUTES*

Plaintiffs and Defendants consent to the following-described procedure for resolving any disputes during the term of this Agreement concerning Defendants' compliance with obligations and commitments, and this process shall be binding upon ADAP, or its successor as Plaintiffs' Counsel:

1. If Plaintiffs reasonably believe that Defendants are not in compliance with a stipulated obligation or commitment, ADAP shall notify the Commissioner promptly, in writing, to specify with particularity the facts and circumstances which support Plaintiffs' perception and to propose a recommended remedy or corrective action. Not less than 10 days after the Commissioner's receipt of this notice, ADAP and the Commissioner, or her designated representatives, shall confer in a good-faith effort to resolve the matter. If they fail to reach an agreement which resolves the dispute, either ADAP

or the Commissioner may request that the Court appoint a Mediator.

2. This procedure shall be deemed a condition precedent to Plaintiffs' filing of any enforcement motion with the District Court, except that it shall not be construed to bar Plaintiffs from seeking immediate judicial relief upon a reasonable belief that a DMH/MR consumer is threatened by an imminent or continuing risk of serious harm, and that Defendants cannot, or will not, eradicate or minimize such risk effectively, regardless of prior notice.

For the purpose of this provision, "risk of serious harm" shall refer to an imminent threat to life or personal safety as a result of physical or emotional abuse, extreme neglect, physical injury, sexual exploitation or sexual assault.

3. Nothing in this Agreement shall be construed to provide Plaintiffs with either a legal or factual basis for relitigating, in any manner, the constitutional sufficiency of the standard or adequacy of care, treatment, or habilitation being provided to DMH/MR consumers in Defendants' mental health and mental retardation facilities. It is the express intent of the Parties that this Settlement Agreement constitute a full, final, and binding resolution of all pending disputes and claims, along with claims and causes of action which could have been asserted in this litigation, concerning Defendants' compliance with minimum constitutional standards for treatment of the mentally ill and habilitation of the mentally retarded.[4]

4. Plaintiffs' January 22, 1993 motion to enforce the 1986 consent decree also claimed that defendants were violating the then-recently enacted Americans with Disabilities Act (ADA). In Wyatt v. Rogers, 985 F.Supp. 1356, 1432–1433 (M.D.Ala.1997) the District Court declined to address Plaintiffs' ADA argument. Noting that *"the plaintiffs have not pointed to anything in the ADA that is not*

*already required by the consent decree,"* the Court expressly declined to resolve the parties' dispute whether the plaintiffs have *"rights under the ADA to services—that is, housing, treatment, habilitation, and the like— in the most integrated environment appropriate to their needs."* The Parties do not hereby resolve that dispute.

Upon judicial approval of this Settlement Agreement, the obligations, commitments, and standards stipulated therein shall be the objective criteria for evaluating Defendants' provision of constitutionally appropriate treatment and habilitation to DMH/MR consumers.

## IV. ATTORNEY'S FEES AND COSTS

Upon judicial approval of this Settlement Agreement Defendants shall pay to Plaintiffs' Counsel the total sum of Three Million Dollars ($3,000,000.00) as a full and final compromise of all claims for attorney's fees and costs for legal representation rendered for Plaintiffs to date in this litigation, including without limitation, the October 7, 1999 Judgment of the District Court, which awarded attorneys' fees and costs for Plaintiffs' legal representation from 1993 through 1997, and any and all claims for attorney's fees and costs for Plaintiffs' legal representation in 1998 and 1999.

Defendants shall not be obligated to pay any additional amounts to Plaintiffs' Counsel for attorney's fees and costs, including without limitation, fees and costs incurred in connection with judicial proceedings to approve this Settlement Agreement and to dismiss this litigation in the District Court and the Court of Appeals.

The amount herein stipulated shall be paid jointly to Plaintiffs' Counsel, designated below, following judicial approval of this Agreement and not later than September 30, 2000:

Alabama Disabilities Advocacy Program
Tuscaloosa, Alabama

Bazelon Center for Mental Health Law
Washington, D.C.

The amount herein stipulated is intended to, and shall, encompass all claims for attorneys' fees and costs by any attorneys, experts, or consultants for the Plaintiffs, and Plaintiffs' Counsel shall assume sole responsibility for, and hold Defendants harmless from, the proper allocation and disbursement of this sum.

## V. TERM OF AGREEMENT

### A. EFFECTIVE DATE

The effective date of this Settlement Agreement shall be the date of the District Court's entry of an Order and Judgment, following the requisite fairness hearing for this class action, which grants the parties' joint motion for approval.

### B. JURISDICTION DURING TERM OF AGREEMENT

During the term of this Agreement the District Court shall retain jurisdiction of this case for the limited purpose of enforcing the parties' Settlement Agreement pursuant to the process specified in Section III.

### C. END OF AGREEMENT

1. The Parties acknowledge that this Settlement Agreement should end, and the District Court's jurisdiction over this litigation should expire, when Defendants have fulfilled all obligations, commitments, and requirements pursuant to the specific provisions of the Agreement. They further acknowledge that the quarterly status conferences between ADAP and the Commissioner, required in Section III–B, are designed, in primary part, to keep ADAP informed on Defendants' progress in achieving the obligations, commitments, and requirements of this Agreement.

The projected ending date is not later than September 30, 2003, which is the final deadline for Defendants' completion of an obligation undertaken in this Agreement. Promptly after Defendants have fulfilled all obligations, commitments, and requirements stipulated in this Agreement, whether that occurrence comes on or before September 30, 2003, the Parties shall cooperate in the filing of a joint motion, or other appropriate pleading, for an Order which declares the Defendants' compliance with this Settlement Agreement, vacates the April 21, 1998 Order and Injunction, and ends the Court's jurisdiction.

2. If the Plaintiffs do not concur that Defendants have fulfilled all obligations, commitments, and requirements pursuant

to the specific provisions of this Agreement, the Parties stipulate that the following-described procedure shall govern the resolution of their dispute:

a. For disputes concerning Defendants' compliance with obligations and commitments which are either to be performed throughout the term of this agreement (Sections II–A, II–C, II–D, II–E, II–F; II–G, II–H II–I, III–B ), OR, to be undertaken within specified deadlines not exceeding one year (Sections II–B; II–G–1(b) II–G–1(c); II–G–2(b); II–H–1(a) and 2(a), for the September 1, 2000 deadline to develop plans):

*The Parties shall be governed by the dispute resolution process set forth at Section III–C.*

b. For disputes concerning Defendants' compliance with their "three-year plan" to achieve—on or before September 30, 2003, the stipulated census reduction in mental illness and mental retardation facilities and to fulfill the requirements for identification, development, and certification of community placements, providers, and service needs, and for promulgating discharge plans (Section II–H–1(b) and 2):

● *The Commissioner shall notify ADAP, or any successor counsel for the plaintiff class, in writing, promptly upon ascertaining any facts or circumstances which, in her professional judgment, may prevent, or adversely affect, Defendants' attainment of the specific census reduction and community placement goals stipulated in Section II–H. The notice to ADAP shall particularize the relevant facts and circumstances, and advise whether, and when, Defendants can and will attain the specific goals. If the Commissioner believes that the goals actually reached constitute compliance sufficient to warrant a judicial declaration that Defendants are entitled to be released from any further*

*obligations, the notice shall communicate that belief. In the alternative, the notice shall include the Defendants' recommended remedy or corrective action to achieve full compliance with Section II–H, including, but not limited to, recommendations to modify, amend, or alter the Settlement Agreement as it relates to any compliance areas then in dispute.*

● *Not less than 10 days after receipt by ADAP of the Commissioner's notice, the Commissioner and ADAP shall confer in a good-faith effort to reach a consensus for a stipulation of compliance, or for a remedy or corrective action, which ends the settlement agreement. If they fail to reach consensus, either ADAP or the Commissioner may request that the Court appoint a Mediator.*

● *This procedure shall be deemed a condition precedent to the filing by Plaintiffs or Defendants of a proper pleading in this case to enforce the Settlement Agreement or to declare that Defendants have complied sufficiently to warrant its end.*

## VI. RELATION TO EXISTING CAUSES OF ACTION AND APPEAL

### A. District Court

Within ten days after execution of this Agreement, the parties shall jointly file in the U.S. District Court for the Middle District of Alabama the following:

(1) A *Joint Motion to Stay all Proceedings* in the District Court, including, without limitation, all discovery and pre-trial deadlines for the trials heretofore scheduled in May and June 2000 for the MI and MR phases of this litigation; all motions for contempt, compliance motions, and any other pending motions filed by either party [5]; all matters which have been referred to a Magistrate Judge or to the court-appointed Special Master;

---

**5.** Only one pending motion is filed by a nonparty to this Settlement Agreement: the Martin–Intervenors' motion for attorney's fees. In its December 15, 1997, Memorandum Opinion and Judgment, *Wyatt v. Rogers*, 985 F.Supp. 1356, 1435 (M.D.Ala.1997), the Court

denied, without prejudice, "the Martin–Intervenors' complaint-in-intervention, filed on January 25, 1991, asserting, among other things, that the care and conditions at one of the state's facilities, the Thomasville Adult Ad-

(2) A copy of this *Settlement Agreement along with a Joint Motion for Judicial Approval of Settlement Agreement and Dismissal of this Case.* Such joint motion shall be filed pursuant to Fed.R. Civ.P. 23(e) and Fed. R.Civ. P. 41(a)(2), and the Parties shall seek dismissal of Civil Action No. 70-T-3195-N, in its entirety and with prejudice, except for jurisdiction over this Settlement Agreement and the Orders referenced at note 1, Section I-C, and the Parties shall also seek the dissolution of the September 22, 1986 Wyatt Consent Decree, including, without limitation, all of the Wyatt Standards, and all prior orders and injunctions of, and standards issued by, the Court regarding the obligations of the state's mental health and mental retardation system.

### B. Court of Appeals

Within fifteen days after execution of this Agreement, the parties shall file a joint motion, and comply with any additional requirements, to suspend all proceedings on each of the following-described appeals now pending in the U.S. Court of Appeals for the Eleventh Circuit, until the District Court completes its fairness hearing and other proceedings on the Joint Motion for Judicial Approval.

justment Center, violated federal statutory

Within five days after the District Court's entry of its judicial approval for this Settlement Agreement, the parties shall file a joint stipulation for the dismissal, with prejudice, of all four appeals.

| Appeal No. | Description |
| --- | --- |
| 98–6038 | Defendants' Appeal from December 15, 1997 Memorandum Opinion and Judgment granting in part, and denying in part, Defendants "Motion for a Finding that Defendants have met their Obligations under the September 22, 1986 Consent Decree and for an Order Terminating this Lawsuit." Wyatt v. Rogers, 985 F.Supp. 1356 (M.D.Ala.1997) |
| 98–6441 | Defendants' appeal from April 28, 1998, and June 3, 1998 Orders imposing costs and fees as a discovery sanction (Docket Nos. 1705, 1731) |
| 99–13457–A | Defendants' appeal from August 11, 1999 "MI" Order and August 26, 1999 "MR" Order assessing fees for Special Master (Docket Nos. 1901, 1912) |
| 99–14128–I | Defendants' appeal from October 7, 1999 Order granting, in part, Plaintiffs' Motion for Attorneys' Fees and Costs (Docket Nos.1954, 1955; 1999 WL 965477). |

and constitutional law."

THE PARTIES HEREBY CONSENT TO THIS AGREEMENT, VOLUNTARILY AND KNOWINGLY, BY THEIR UNDERSIGNED, AUTHORIZED REPRESENTATIVES AND ATTORNEYS, ON THE DATES INDICATED.

PLAINTIFFS

January 70, 2000

James A. Tucker, Associate Director
Alabama Disabilities Advocacy Program

DEFENDANTS

January 20, 2000

Kathy A. Sawyer, Commissioner
Alabama Department of Mental
Health and Mental Retardation

January 20, 2000

Courtney S. Tarver, Deputy Attorney
General and General Counsel for the
Alabama Department of Mental Health
and Mental Retardation

January 20, 2000

Don Siegelman, Governor
State of Alabama

January 20, 2000

Bill Pryor, Attorney General
State of Alabama

## APPENDIX TO SETTLEMENT AGREEMENT

## INCORPORATION OF WYATT STANDARDS IN DMH//MR POLICY MANUAL

| Wyatt MI Standard | DMH/MR Policy | |
|---|---|---|
| 1 | 8–1 | Internal Rights Protection and Advocacy Program |
| | 8–12 | Advocacy Information and Referral Services |
| | 18–16 | Rights Compliance Monitoring |
| | 18–18 | Inter/Intra—Agency Collaborations |
| | 19–10 | Abuse & Neglect |
| | 19–40 | Freedom from experimentation without informed, written consent |
| | 20–42 | Privacy/Confidentiality |

| Wyatt MI Standard | DMH/MR Policy | |
|---|---|---|
| | 20–46 | Personal Possessions |
| | 20–48 | Communication and Social Contacts |
| | 20–66 | Participation in Planning Treatment/Habilitation |
| | 330–5 | Client Records: Confidentiality and Security |
| | 430–5 | Patient Seclusion and Restraint |
| 2 | 20–68 | Least Restrictive Conditions |
| | 20–28 | Restriction of Patient Rights |
| | 430–5 | Patient Seclusion and Restraint |
| 6 | 430–20 | Informed Consent for Psychiatric Medications |
| | 530–10 | Informed Consent for Certain Psychiatric Medications |
| 7 | 430–5 | Patient Seclusion and Restraint |
| | 430–10 | Psychiatric Emergency Management Course |
| 19 | 20–38 | Safe and Humane Environment |
| | 20–56 | Labor |
| 26 | 20–64 | Individualized Treatment/Habilitation |
| 34 | 350–5 | Discharging Patients |
| | 420–5 | APRIL Level of Care Assessment |

| Wyatt MR Standard | DMH/MR Policy Manual | |
|---|---|---|
| 1 | 20–22 | Civil and Legal Rights |
| | 20–24 | Informed Regarding Rights |
| | 20–26 | Due Process |
| | 20–32 | Education |
| | 20–62 | Quality Treatment |
| | 20–64 | Individualized Treatment/Habilitation |
| | 20–66 | Participation in Planning Treatment/Habilitation |
| | 60–86 | Professional Licensure and Qualifications |
| | 20–24 | Informed Regarding Rights |
| | 20–26 | Due Process |
| | 20–32 | Education |
| | 20–62 | Quality Treatment |
| | 20–64 | Individualized Treatment/Habilitation |
| | 20–66 | Participation in Planning Treatment/Habilitation |
| | 20–68 | Least Restrictive Conditions |
| 3 | 20–22 | Civil and Legal Rights |
| | 20–46 | Personal Possessions |
| | 20–48 | Communication and Social Contacts |
| | 20–62 | Quality Treatment |

| Wyatt MR Standard | DMH/MR Policy Manual | |
|---|---|---|
| | 20–68 | Least Restrictive Conditions |
| | 350–5 | Discharging Clients |
| | 220–20 | Referral for Mental Retardation Services for Persons Residing in a DMH/MR Facility |
| 10 | 20–64 | Individualized Treatment/Habilitation |
| | 20–66 | Participation in Planning Treatment/Habilitation |
| | 20–68 | Least Restrictive Conditions |
| | 350–5 | Discharging Clients |
| | 410–15 | Transfers Between DMH/MR Mental Illness Facilities |
| | 530–10 | Informed Consent for Certain Psychiatric Medications |
| 11 | 20–62 | Quality Treatment |
| | 20–64 | Individualized Treatment/Habilitation |
| | 20–66 | Participation in Planning Treatment/Habilitation |
| | 20–68 | Least Restrictive Conditions |
| | 220–10 | Referral for Confirmation of Mental Retardation or Mental Illness |
| | 220–20 | Referral for Mental Retardation Services for Persons Residing in a DMH/MR Facility |
| 12 | 20–48 | Communication and Social Contacts |
| | 20–64 | Individualized Treatment/Habilitation |
| | 20–68 | Least Restrictive Conditions |
| 15 | 19–10 | Abuse of Clients |
| | 20–22 | Civil and Legal Rights |
| | 20–38 | Safe and Humane Environment |
| | 20–40 | Protection from Harm |
| | 20–42 | Privacy/Confidentiality |
| | 20–46 | Personal Possessions |
| | 20–48 | Communication and Social Contacts |
| | 20–56 | Labor |
| | 20–62 | Quality Treatment |
| | 20–64 | Individualized Treatment/Habilitation |
| | 20–68 | Least Restrictive Conditions |
| | 20–70 | Research and Experimentation |
| 16 | 19–40 | Research |
| | 20–22 | Civil and Legal Rights |
| | 20–26 | Due Process |
| | 35–15 | Individualized Financial Needs Evaluations Of Social Security Beneficiaries |
| | 330–5 | Client Records: Confidentiality |
| 22 | 20–62 | Quality Treatment |

| Wyatt MR Standard | DMH/MR Policy Manual | |
|---|---|---|
| | 530–10 | Informed Consent for certain Psychiatric Medications |
| 28 | 19–10 | Abuse of Clients |
| | 19–20 | Reporting of Sexual Abuse |
| | 19–70 | Notification of Special Incidents |
| | 20–22 | Civil and Legal Rights |
| | 20–38 | Safe and Humane Environment |
| | 20–40 | Protection from Harm |
| 34 | 19–10 | Abuse of Clients |
| | 20–38 | Safe and Humane Environment |
| | 20–62 | Quality Treatment |
| 35 | 20–38 | Safe and Humane Environment |
| | 20–46 | Personal Possessions |
| 37 | 19–10 | Abuse of Clients |
| | 20–38 | Safe and Humane Environment |
| | 20–46 | Personal Possessions |
| | 20–64 | Individualized Treatment/Habilitation |
| | 20–66 | Participation in Planning Treatment/Habilitation |
| | 20–74 | Recipient's Responsibility |
| 41 | 20–62 | Quality Treatment |
| | 20–64 | Individualized Treatment/Habilitation |
| | 60–86 | Professional Licensure and Qualifications |
| 43 | 20–66 | Participation in Planning Treatment/Habilitation |
| 47 | 20–64 | Individualized Treatment/Habilitation |
| | 20–66 | Participation in Planning Treatment/Habilitation |
| | 20–68 | Least Restrictive Conditions |
| | 350–5 | Discharging Clients |
| 49 | 20–22 | Civil and Legal Rights |
| | 20–62 | Quality Treatment |
| | 20–64 | Individualized Treatment/Habilitation |
| | 20–68 | Least Restrictive Conditions |
| | 350–5 | Discharging Clients |