**Ricky WYATT, by and through his aunt and legal guardian Mrs. W. C. RAWLINS, Jr., et al., Plaintiffs,**

v.

**Kathy E. SAWYER, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health Officer, et al., Defendants.**

**United States of America, Amicus Curiae.**

No. CIV.A. 70–T–3195–N.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 13, 2004.

---

Ira A. Burnim, Andrew Bridge, Shelley Jackson, Claudia Schlosberg, Ellen Harris, Mary Giliberti, Leonard S. Rubenstein, Linda V. Priebe, James M. Lichtman, Ropes & Gray, Washington, DC, Michael S. Scheier, Fern Singer, Baker, Donelson, Bearman, Caldwell & Berkowitz PC, Kathryn H. Sumrall, Harrington & Sturdvant, Birmingham, AL, James A. Tucker, Lauren Wilson–Carr, Tuscaloosa, AL, Allen Smith, Jr., Warm Springs, MT, Iris E. Bell, Denver, CO, James B. Rhoads, Burr & Forman, LLP, Atlanta, GA, for Plaintiffs.

Reuben Wright Cook, Donald G. Tipper, Apsilah Owens Millsaps, John A. Owens, Owens & Almond, LLP, Anita K. Hamlett, Drew P. Baker, James A. Tucker, Tuscaloosa, AL, Victoria Ann Farr, Attorney at Law, Northport, AL, David Ferleger, Bala Cynwyd, PA, Ira A. Burnim, Andrew Bridge, Shelley Jackson, Claudia Schlosberg, Ellen Harris, Mary Giliberti, Washington, DC, Fern Singer, Baker, Donelson, Bearman, Caldwell & Berkowitz PC, Kathryn H. Sumrall, Harrington & Sturdvant, Birmingham, AL, Allen Smith, Jr., Warm Springs, MT, for Intervenors-Plaintiffs.

Patrick C. Davidson, Adams, Umbach, Davidson & White LLP, Opelika, AL, Robert F. Northcutt, Capell Howard PC, Milton J.

Westry, DeBardelaben, Norwood & Westry LLC, Charles B. Campbell, Office of the Attorney General, June E. Lynn, G. R. (Rick) Trawick, Algert S. Agricola, Jr., Gregory D. Crosslin, Clifton E. Slaten, Mindi C. Robinson, Slaten & O'Connor, PC, Robert E. Sasser, Patrick Sefton, Sasser, Littleton & Stidham PC, James D. Hamlett, Edward A. Hosp, Maynard, Cooper & Gale, P.C., Delores R. Boyd, David E. Jackson, Troy R. King, Office of the Governor, Montgomery, AL, Joel Klein, Klein, Farr, Smith & Taranto, Paul Smith, Genner & Block, Washington, DC, Rebecca W. Pritchett, Sirote & Permutt, P.C., Ricky J. McKinney, Burr & Forman LLP, Birmingham, AL, Mary Elizabeth Culberson, Elmore County District Court, Wetumpka, AL, for Defendants.

Pamela Chen, Deval L. Patrick, Robinsue Frohboese, Judith C. Preston, Tawana E. Davis, Robert C. Bowman, Richard J. Farano, Robert H. Stern, David Deutsch, U.S. Department of Justice, Washington, DC, Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, for Amicus.

## OPINION

MYRON H. THOMPSON, District Judge.

More than two decades ago, Professor Owen Fiss wrote about the dilemma facing judges in structural reform cases:

> "The judge might be seen as forever straddling two worlds, the world of the ideal and the world of the practical, the world of the public value and the world of subjective preference, the world of the Constitution and the world of politics. He derives his legitimacy from only one, but necessarily finds himself in the other."

Owen Fiss, *The Forms of Justice*, 93 Harv. L.Rev. 1, 58 (1979). This tension has often been apparent in this case, *Wyatt v. Sawyer*, civil action no. 70–T–3195 (M.D.Ala.), in which the constitutionality of the conditions in Alabama's Mental Health and Mental Retardation System has been litigated for more than 30 years. Even now a distance remains between the real and the ideal.

However, this case illustrates why, despite the difficulties inherent in structural reform litigation, such cases are, finally, so important and worthwhile. While this case has followed a "long, winding, and often quite bumpy" road, *Wyatt v. Sawyer*, 105 F.Supp.2d 1234, 1236 (M.D.Ala.2000), the enormity of what this case has accomplished cannot be overstated. The principles of humane treatment of people with mental illness and mental retardation embodied in this litigation have become part of the fabric of law in this country and, indeed, international law.

Today, this case is before the court on the parties' joint motion (1) for a declaration that the Alabama Department of Mental Health and Mental Retardation has complied with a 2000 settlement agreement and (2) to vacate all remaining orders and injunctions. On December 5, 2003, this court held a fairness hearing which many interested persons attended, including members of the plaintiff class (including the named original plaintiff, Ricky Wyatt) and various state officials (including Alabama Governor Bob Riley, Alabama Mental Health and Mental Retardation Commissioner Kathy Sawyer, and State Finance Director Drayton Nabers). After a careful consideration of the entire record, the court stated in open court, at the end of the fairness hearing, that it would grant the motion, and promised that a written opinion and final judgment would follow. This is the promised opinion.

## I. BACKGROUND

The procedural history of this case has been described in earlier opinions, *see, e.g.*, *Wyatt v. Sawyer*, 105 F.Supp.2d 1234 (M.D.Ala.2000); *Wyatt v. Rogers*, 985 F.Supp. 1356 (M.D.Ala.1997), and will not be repeated here with the exception of the following.

In 1971, when Judge Frank M. Johnson, Jr. issued the first order in this case, there were thousands of patients hospitalized in Alabama, ostensibly for mental-health treatment. Most of them were "involuntarily committed through non-criminal procedures and without the constitutional protections that are afforded defendants in criminal proceedings." *Wyatt v. Stickney*, 325 F.Supp. 781, 784 (M.D.Ala.1971). Many, if not most, of these patients received no treatment what-

soever. *Id.* Patients were housed in inhumane conditions in "barn-like" dormitories plagued by overcrowding, extreme ventilation problems, and fire and other emergency hazards. *Wyatt v. Stickney,* 334 F.Supp. 1341, 1343 (M.D.Ala.1971). The staff at the hospitals was under-qualified and stretched much too thin, and the patients did not have individualized treatment plans. *Id.* at 1343–44. "Also contributing to the poor psychological environment [were] the shoddy wearing apparel furnished the patients, the nontherapeutic work assigned the patients … and the degrading and humiliating admissions procedure which create[d] in the patient an impression of the hospital as a prison or as a 'crazy house.'" *Id.* at 1343. A journalist who visited the Jemison building at Bryce Hospital in 1971 described the conditions there as follows:

> "Human feces were caked on the toilets and walls, urine saturated the aging oak floors, many beds lacked linen, some patients slept on floors, archaic shower stalls had cracked and spewing shower heads. One tiny shower closet served 131 male patients; the 75 women patients also had but one shower. Most of the patients at Jemison were highly tranquilized and had not been bathed in days. All appeared to lack any semblance of treatment. The stench was almost unbearable."

Jack Bass, *Taming the Storm: The Life and Times of Judge Frank M. Johnson, Jr. and the South's Fight over Civil Rights,* 292 (1993).

Judge Johnson declared that these conditions were unconstitutional because "[t]o deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process." *Wyatt,* 325 F.Supp. at 785. Drawing on the parties' joint proposal, Judge Johnson entered landmark opinions setting forth minimum constitutional standards for the treatment of people with mental illness and mental retardation. These standards would come to be known as the "*Wyatt* standards." *Wyatt v. Rogers,* 92 F.3d 1074, 1077 (11th Cir.1996).

The *Wyatt* standards have had a reverberating impact on state and national law, and, perhaps even more importantly, on public consciousness about mental illness. The standards have been incorporated into state and federal mental-health codes and regulations. The concept of treatment in the "least restrictive setting" contained in the *Wyatt* standards was "echoed" in the Americans with Disabilities Act of 1990, Pub.L. No. 101–336, 104 Stat. 328 (codified as amended at 42 U.S.C.A. §§ 12101–12213 and 47 U.S.C.A. § 225), as the Supreme Court affirmed in 1999 in *Olmstead v. L.C.,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).[1] Dick Thornburgh and Ira Burnim, *Dedication to Frank M. Johnson, Jr.,* 23 Mental & Physical Disability L. Rep. 606, 606 (1999). The nationwide Protection and Advocacy system is a "direct descendant" of the Human Rights Committees Judge Johnson appointed in the *Wyatt* case.[2] *Id.* Part of Judge Johnson's

---

**1.** The Americans with Disabilities Act is an anti-discrimination law whose purpose is "(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; (3) to ensure that the Federal Government plays a central role in enforcing the standards established [by the law] on behalf of individuals with disabilities; and (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C.A. § 12101.

**2.** The Protection and Advocacy system is a congressionally mandated network of legal advocacy programs that serve people with disabilities. It was created by the Developmental Disabilities Assistance and Bill of Rights Act of 1975, Pub.L. No. 94–103, 89 Stat. 486 (codified as amended at 42 U.S.C.A. §§ 6041–6043). State Protection and Advocacy agencies administer programs created by several federal statutes, including the Protection and Advocacy for Individuals with Mental Illness program, authorized by the Protection and Advocacy for Mentally Ill Individuals Act of 1986, Pub.L. No. 99–319, 100 Stat. 478 (codified as amended at 42 U.S.C.A. §§ 10801–10851, 247a), and the Protection and Advocacy for Individual Rights program, authorized in the Rehabilitation Act of 1973, Pub.L. No. 93–112, as amended by Pub.L. No. 106–402 (codified at 29 U.S.C.A. § 794e).

March 1972 opinion enumerating rights due the plaintiff class, such as the right to privacy, the right to be treated with dignity, and the right to be free of unnecessary medication and physical restraint, has come to be known among mental-health professionals as a "bill of rights for patients." Bass, *supra,* 293.

Finally, *Wyatt* heightened public awareness of the needs of institutionalized people and people with mental illness and mental retardation. Katie Eyer, *Litigating for Treatment: The Use of State Laws and Constitutions in Obtaining Treatment for Individuals with Mental Illness,* 28 N.Y.U. Rev. L. & Soc. Change 1, 5–6 (2003). Today, as a result, any judge, legislator, or executive official who would seek to reverse the everyday involvement and oversight of state and local advocacy groups, friends and family members of people with mental disabilities, and self-advocacy by consumers of mental-health care, would face universal condemnation. This legacy of this litigation cannot be terminated by any court.

In 2000, the parties to this litigation entered into a settlement agreement, approved by the court, that ended the court's longstanding monitoring and control of the Department of Mental Health and Mental Retardation. The settlement, however, required the defendants to maintain their commitment to minimum constitutional standards for treatment and habilitation and to expand the services to the mentally ill and mentally retarded; it also contained a projected end date of not later than September 30, 2003. *Wyatt v. Sawyer,* 105 F.Supp.2d 1234, 1237–1239 (M.D.Ala.2000).

## II. DISCUSSION

■ Judicial policy favors voluntary settlement of class action cases. *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977).[3] Further, returning governmental entities to the control of state authorities "at the earliest practicable date is essential to restore their true accountability to our governmental system."

*Freeman v. Pitts,* 503 U.S. 467, 490, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992).

■ However, "the settlement process is more susceptible than the adversarial process to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is 'fair, adequate, and reasonable.'" *Paradise v. Wells,* 686 F.Supp. 1442, 1444 (M.D.Ala.1988); *accord* Fed.R.Civ.P. 23(e)(1)(C) ("The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement is fair, reasonable, and adequate."). Court review is "essential to assure adequate representation of class members who have not participated in shaping the settlement." Fed.R.Civ.P. 23(e) advisory committee's note. In addition to analyzing the fairness of the joint motion, the court must assure that it is not illegal or against public policy. *Paradise,* 686 F.Supp. at 1448; *Piambino v. Bailey,* 757 F.2d 1112, 1119 (11th Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986). The court must also determine whether notice to the class was adequate, Fed.R.Civ.P. 23(e), and must examine the plaintiff class members' comments and objections, *Paradise,* 686 F.Supp. at 1444, and the judgment of counsel, *id.* at 1446.

### A. Class Notice

■ Rule 23(e) of the Federal Rules of Civil Procedure requires that the court ensure that all interested parties be informed of the settlement of this case and have the opportunity to voice their objections. The issue of notice is particularly salient in this litigation because many members of the plaintiff class face barriers to advocating effectively on their own behalf. "The court must therefore take special care to ensure not only that the class members themselves, but also their guardians, advocates, and other interested persons were notified of the proposed settlement agreement and given adequate opportunities to voice their opinions on the class members' behalf." *Wyatt v. Saw-*

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

*yer*, 105 F.Supp.2d 1234, 1239 (M.D.Ala. 2000).

The court-approved notice was directed to patients, residents, clients, and consumers served by the Alabama Department of Mental Health and Mental Retardation, their families, and legal guardians; individuals, groups, and organizations involved in advocacy or support for the rights of Alabama's citizens with mental illness and mental retardation; and interested members of the general public. The notice advised that the parties to this case had jointly informed the court that the terms of the 2000 settlement agreement had been met and that the parties had jointly moved the court to dismiss the case. In plain and simple language, the notice highlighted the fact that a fairness hearing would be held to determine whether the case should be dismissed. The notice identified the lawyers to whom questions could be directed and explained the procedure for making objections. It also included the date, time, and place for the fairness hearing and stated that anyone could attend the fairness hearing.

As demonstrated by the parties' joint evidentiary submission regarding the notice and timely filed responses, the parties disseminated the notices as stipulated. The notices were posted prominently in the living areas of all facilities covered by the agreement, and were hand-delivered to approximately 600 patients and residents, while developmental advocates consulted with another 324 for whom hand-delivery was deemed clinically inappropriate; mail-delivery notice was given to 492 persons who are legal guardians or responsible parties for patients and residents; and 16 notices were mailed to consumer and advocacy organizations with statewide constituencies. The notice was also published in the newspaper in each metropolitan area housing a mental-health facility, and the parties' counsel made joint presentations to various advocacy groups.

The adequacy of the notice is reflected, in part, by the substantial number of written responses timely filed before the December 5 fairness hearing and by the attendance and participation at the hearing. Thirty-one comments were received; 28 of these were timely, although the court still allowed the untimely objectors to be heard at the hearing. Many class members and advocates attended and took the opportunity to voice their objections to the proposed dismissal at the hearing. The court concludes that these measures, taken together, were sufficient to satisfy the notice requirement of Rule 23(e).

### B. Plaintiff Class Members' Objections and Comments

The court cannot deny that there are numerous persons throughout the State who do not agree with counsel for the parties that this case should be terminated. Several of these persons submitted written objections or spoke at the fairness hearing. Many of these objections were elegantly phrased and powerfully brought home the gravity of the concerns at issue. Other objections, in particular written ones, were difficult to read, but in their inartfulness they conveyed, perhaps even more profoundly, the import of the human concerns that lie at the heart of this case. The court takes all of the objections very seriously, including those concerning facility conditions, grievance procedures, and community placement.

As noted above, 31 written comments were received, 28 of which were timely. Two of the timely filed comments and one untimely filed comment were in support of the dismissal: these were from the ARC of Alabama, the National Alliance for the Mentally Ill of Alabama, and the Mental Health Association of Alabama, all of which represent hundreds of consumers and their families. A representative from the National Alliance was also among those who spoke at the fairness hearing. These organizations stated that the Department of Mental Health and Mental Retardation has made significant progress over the last three years and has lived up to its obligations under the 2000 settlement agreement.

Twenty-six of the timely-filed comments and two of the untimely ones were in the nature of objections. Eight objections were from the family members or legal guardians of residents at J.S. Tarwater Developmental Center who objected to the planned closure of Tarwater because they fear for their loved

ones' safety and well-being if they are placed in group homes or in other facilities in different parts of the State. An objection from Betty Lyons, president of the Friends of Brewer, stated concerns about the quality of care that residents of Brewer Center will receive in the community once Brewer closes. Several of the objections were from patients or former patients of Bryce Hospital, North Alabama Regional Hospital, and Searcy Hospital, and complained of conditions at those facilities. Many of the objectors voiced concerns over the State's funding of the Mental Health and Mental Retardation Department and stated general concerns that the State would go back to its old ways if court oversight were ended.

Many plaintiff class members, consumer advocates, and family members spoke at the December 5 fairness hearing. Those who spoke included Loren Caswell, Charles Davis, Michael Hart, Anthony Schefano, Pamela Trammell, Greg Carlson, Alvin Callier, Robert Landis Williams, Mary Carter, and Javis Wilson. Many of the speakers were nervous, and it was apparent that it took tremendous courage for them to come forward, in open court, and take issue with the views of seasoned lawyers and respected public officials (including the State Governor and the Mental Health Commissioner) over the direction of this litigation. The comments, which were often touching, focused on three main areas: the closing of Tarwater; funding for the Mental Health and Mental Retardation System; and conditions at Bryce Hospital, including allegations of inadequate staffing, overmedication, residents being confined to small areas all day, unsanitary clothing due to deficient laundry service, problems with pests, and difficulty in reaching consumer advocates.

The defendants filed a report which responded to some of the objections made at the fairness hearing; the report also described the systems already in place to assure that the Department of Mental Health and Mental Retardation receives, responds to, and addresses concerns raised by facility residents, other consumers, consumers' families, and other interested parties. Further,

at the fairness hearing, Commissioner Sawyer promised the court that an additional forum resembling the fairness hearing itself would be established and held regularly so that consumers and others could voice concerns. The parties have advised the court that this forum will take the form of periodic "therap[e]utic community meetings" at Bryce Hospital, resembling those already held at other long-term care facilities; consumers, facility staff and administrators, and department-assigned advocates will attend these meetings, and notice will also be given to outside advocates from the Alabama Disabilities Advocacy Program.[4] The court is also reassured by the representations of plaintiffs' counsel that they will work with the Mental Health and Mental Retardation Department to assure that the objections and concerns addressed to the court will be resolved quickly.

## C. Judgment of Counsel

"In addressing whether a settlement is fair, adequate, and reasonable, a court should also consider the judgment of experienced counsel for the parties." *Paradise v. Wells,* 686 F.Supp. 1442, 1446 (M.D.Ala.1988). It is the shared opinion of counsel for the defendants and the plaintiffs that the defendants have substantially complied with the commitments they made in the settlement agreement reached and approved by this court in 2000. *See Wyatt v. Sawyer,* 105 F.Supp.2d 1234, 1237–1239 (M.D.Ala.2000). Plaintiffs' counsel have frankly acknowledged the complexity and difficulty of agreeing to end this case after 33 years of often tumultuous litigation. Even so, while candidly expressing their concerns, they have declared their view that the defendants have substantially complied with the terms of the 2000 settlement agreement. Thus, they agree that this case should be dismissed in accordance with the terms of that agreement.

The plaintiffs' attorneys have a significant background in disability law, particularly in mental-health law. Each of the two attorneys who have been the plaintiffs' counsel in the last 18 years has extensive experience in litigating, negotiating, and implementing

---

4. Special report, filed Dec. 12, 2003 (Doc. no. 2249).

structural reforms on behalf of individuals with disabilities in institutional settings. No one has questioned in any manner their dedication to the plaintiff class; rather, plaintiffs' counsel have shown an unflagging commitment both to the plaintiff class members and to the constitutional values at stake in this case. Accordingly, their views carry great weight with this court.

### D. Assessment of the Joint Motion

 Finally, with the above considerations in mind, the court must itself assess whether the dismissal of this case is fair, reasonable, and adequate. *Paradise,* 686 F.Supp. at 1448. Because the joint motion before the court proposes to end court supervision and restore full control over the Mental Health and Mental Retardation Department to the State, the court must consider three other factors: whether there has been full and satisfactory compliance with the court's outstanding orders; whether retention of judicial control is necessary or practical to achieve compliance with any outstanding orders; and whether the department has demonstrated to the public and to the plaintiff class its good-faith commitment to the whole of the court's orders and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first place. *Williams v. Montgomery County Sheriff's Dept.,* 99 F.Supp.2d 1330, 1334 (M.D.Ala.2000); *see also Freeman v. Pitts,* 503 U.S. 467, 491, 112 S.Ct. 1430, 1446, 118 L.Ed.2d 108 (1992).

The court finds that the proposed dismissal of this case meets these standards. The 2000 settlement agreement imposed requirements on the Department of Mental Health and Mental Retardation and provided avenues for the outplacement of Alabama's mental-health consumers into the community, while ensuring that such decisions were made on an individualized basis and with adequate safeguards for each consumer's health and safety. The defendants have substantially complied with those requirements.

Of utmost importance to this court in approving the dismissal of this case is the good faith shown by the State of Alabama and its Department of Mental Health and Mental Retardation and, in particular, by Commis-

sioner Sawyer and Governor Riley. As this court noted in an earlier order, one of the court's primary concerns has been the "past unwillingness of [the department] to address rather than hide serious problems." *Wyatt v. Sawyer,* 190 F.R.D. 685, 689 (M.D.Ala. 1999). However, since the beginning of her tenure, Commissioner Sawyer "has made clear that all problems will be 'aired' and that all will be directly and forcefully addressed." *Id.* (citing *Wyatt v. Sawyer,* 67 F.Supp.2d 1331, 1358 (M.D.Ala.1999)). The Commissioner's guarantee to this court, discussed above, that the department will establish a forum at which consumers can voice concerns about their treatment, satisfies the court that the department will continue this commitment to openness and to solving problems as they arise.

The adequacy of funding for the department has been a serious concern in this case, particularly in this time of fiscal crisis for the State. The Governor and the Alabama Legislature have maintained the funding necessary to fulfill the terms of the 2000 settlement agreement. During the December 5 fairness hearing, Governor Riley, Commissioner Sawyer, and Finance Director Nabers also assured this court and the plaintiff class that, in fiscal year 2005 and beyond, they will do everything in their power to see that the State of Alabama provides necessary financial support for the Mental Health and Mental Retardation System.

Finally, the court finds that the dismissal of this case complies with state and federal law.

### III. CONCLUSION

It is appropriate to conclude this opinion with the comments of Governor Riley at the December 5 fairness hearing, comments which aptly summarize the import of the dismissal of this lawsuit: "We do not look at the end of this case as a diminishment of our responsibilities, but as more of a responsibility we have to shoulder ourselves." Indeed, if the State fails to shoulder its responsibility, it will find itself back in court as sure as the night follows the day, albeit a defendant in a new and separate lawsuit seeking enforce-

ment of the now well-established principles of this litigation. In this sense, this litigation, the *Wyatt* case, has not ended; its principles (now codified in statutes and regulations) of humane treatment for people with mental illness and mental retardation remain, ever present and hovering over the State.

An appropriate judgment will be entered

## JUDGMENT

In accordance with the memorandum opinion entered today, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) The objections to termination of this litigation and dismissal of this lawsuit, filed by various individuals and entities, are overruled.

(2) It is DECLARED that the defendants have adequately complied with the settlement agreement, submitted to the court on January 27, 2000 (Doc. no.2052), filed May 5, 2000 (Doc. no. 2141), and approved by the court on May 5, 2000 (Doc. no. 2142).

(3) The joint motion for declaration of defendants' compliance, etc., filed on October 14, 2003 (Doc. No. 2208), is granted.

(4) All prior outstanding orders and injunctions are dissolved with prejudice.

(5) This lawsuit is dismissed in its entirety with prejudice.

It is further ORDERED that costs are taxed against the defendants, for which execution may issue.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.